Charles M. PELLATON, Defendant Below, Appellant, Cross–Appellee,

v.

The BANK OF NEW YORK, a New York banking corporation, assignee of the Bank of New York (Delaware), a Delaware banking corporation, Plaintiff Below, Appellee, Cross–Appellant.

Supreme Court of Delaware.

Submitted March 12, 1991.

Decided May 13, 1991.

Samuel J. Frabizzio, Wilmington, for appellant, cross-appellee.

Max S. Bell, Jr. (argued), and Scott J. Finkelstein of Richards, Layton and Finger, Wilmington, for appellee, cross-appellant.

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ.

HOLLAND, Justice:

This action originated in the Superior Court when, pursuant to Superior Court Civil Rule 58.1, The Bank of New York ("BNY")[1] requested the Prothonotary's Office to commence proceedings to confess two judgments on its behalf against Charles Pellaton ("Pellaton"). Pellaton objected to the entry of both judgments.

---

1. The loan at issue in this matter was actually made by the Bank of New York (Delaware) and was later assigned to The Bank of New York. "BNY" refers to both.

Therefore, the Superior Court held hearings to determine if Pellaton had waived his rights to notice and a hearing prior to the entry of the judgments. Super.Ct. Civ.R. 58.1(d)(5). The Superior Court concluded that Pellaton had effectively waived those rights.

On April 20, 1990, the Superior Court ordered that the two judgments be entered in favor of BNY against Pellaton. However, the Superior Court limited Pellaton's aggregate liability on the judgments to $1,933,000.00, approximately one-third of the amount of a related mortgage.[2] This is Pellaton's direct appeal of the Superior Court's decision to enter both judgments against him. BNY has filed a cross-appeal from the Superior Court's decision limiting Pellaton's aggregate liability to $1,933,-000.00.

In this appeal, Pellaton does not dispute that he signed two personal guaranties of payment for the benefit of BNY, which contained warrants to confess judgment against him in the event of a default by the principal obligor. However, according to Pellaton, he signed the personal guaranties on the advice of his own legal counsel without reading them. Pellaton argues that, given those facts, the Superior Court erred in finding that he had effectively waived his right to notice and a hearing prior to the entry of either judgment.

BNY contends that the Superior Court's decision to authorize the entry of judgments by confession in its favor against Pellaton was proper. According to BNY, the Superior Court correctly decided that Pellaton had waived his rights because he had every opportunity to inform himself about the warrants to confess judgment, which were set forth in the personal guaranties, before he signed them. However, in its cross-claim, BNY contends that the Superior Court erred when it limited Pellaton's aggregate liability on those judgments to $1,933,000.00.

We have concluded that each of BNY's positions are correct. Therefore, the Supe-

rior Court's decision to enter both judgments against Pellaton, pursuant to the warrants of confession, is affirmed. However, the Superior Court's decision to limit Pellaton's aggregate liability to $1,933,-000.00 is reversed.

*Facts*

The facts of this case are not in dispute. On December 1, 1989, BNY filed a praecipe in the Prothonotary's Office of the Superior Court, pursuant to Superior Court Civil Rule 58.1(a). That praecipe directed the Prothonotary to commence proceedings to confess two judgments against Pellaton on behalf of BNY. The Prothonotary mailed notice letters to Pellaton, along with a copy of the personal guaranties which contained the warrants to confess judgment. Super. Ct.Civ.R. 58.1(d). The letters informed Pellaton that BNY intended to obtain judgments against him pursuant to the warrants, and that BNY alleged that Pellaton had waived his rights to notice and a hearing prior to the entry of each judgment. *Id.* In addition, the letters from the Prothonotary informed Pellaton that he could appear before the Superior Court, object to the entry of the judgments against him, and, if he did so, a hearing would be scheduled to determine whether he had waived his rights to notice and a hearing. *Id.*

Pellaton did appear and object to the entry of the judgments against him. Super.Ct.Civ.R. 58.1(d)(5). The Superior Court held a hearing to determine whether Pellaton had properly waived his right to notice and a hearing before each judgment was entered. *Id.* The record of that hearing reflected that Pellaton had been in the real estate business for a number of years. During that time, Pellaton had been involved with the financing or the refinancing of many properties. Prior to the transaction which is at issue in this case, Pellaton was involved in separate loan transactions with BNY in October and November of 1985. In both of those 1985 transactions with BNY, Pellaton executed personal

2. The note and mortgage recite an indebtedness of $5,800,000.00. However, only $5,500,000.00 was actually advanced by BNY.

guaranties with warrants to confess judgment, which were similar to the guaranties that were a part of the loan documents in this case.

This litigation originated from a loan of $5,800,000.00 made by BNY in 1987 to refinance the Castle Mall ("Mall") property located in New Castle County, Delaware. Delaware Mall Associates, Limited Partnership ("DMALP"), a Delaware limited partnership, was the beneficial owner of the Mall. University Mall Associates ("UMA") was the general partner of DMALP, and Pellaton was one of three limited partners.

In early May, 1987, Pellaton, on behalf of UMA, applied to BNY for a loan to refinance the Mall. UMA, as the general partner of DMALP, was acting on behalf of DMALP. On March 5, 1987, BNY issued a commitment letter to UMA which recited the terms of the loan that BNY was willing to make to refinance the Mall.

The commitment letter from BNY indicated that personal guaranties from Pellaton and the other two limited partners of DMALP were required to secure the loan to refinance the Mall. The BNY commitment letter was sent to Pellaton and stated, in part, that:

> The Guarantors shall also provide ... a guaranty of payment of monthly debt service on the Note [Guaranty of Debt Service] ... [and] a guaranty of payment ... of all other amounts due on the Loan [Guaranty of Payment].

Pellaton accepted the terms of the commitment letter on April 7, 1987, by signing and returning the letter to BNY.

The loan closing to refinance the Mall took place on May 7, 1987. Two weeks prior to the scheduled settlement date, BNY sent copies of the proposed loan closing documents to Pellaton's Delaware attorney. Pellaton's Delaware attorney forwarded those documents to Pellaton's New York attorney. At the loan closing, Pellaton was represented by both his Delaware attorney and his attorney from New York.

Pellaton signed all of the loan closing documents, including the personal guaranties,[3] which had been forwarded to his attorneys and were required by the terms of the commitment letter. By signing the Guaranty of Debt Service, Pellaton personally guaranteed BNY's timely receipt of the entire monthly installments of interest due under the loan. Pellaton also signed the Guaranty of Payment, pursuant to which he personally guaranteed the timely payment of a portion of the principal amount that may become due under the loan.

Both of the personal guaranties[4] signed by Pellaton contained warrants to confess judgment. These provisions authorized any attorney to appear on behalf of Pellaton and confess judgment against him in any Delaware court, in the event of a default. Pursuant to each personal guaranty, Pellaton also waived any issuance or service of process if an attorney appeared to enter judgment against him by confession, based upon the warrants.

At the loan closing on May 7, 1987, Pellaton also executed separate sworn affidavits in connection with each of his personal guaranties. Both of those affidavits were short and doubled spaced, containing one complete page of text and three lines of text on the second page. The first and third paragraphs of each of the affidavits contained the following language:

> The undersigned has executed a Guaranty ... dated as of the 7th day of May, 1987, in favor of the Bank of New York ... which ... Guaranty contains a warrant to confess judgment against the undersigned.

> Entry of judgment in the Superior Court of the State of Delaware in and for New Castle County is hereby authorized.

The affidavits were notarized by Pellaton's Delaware attorney. In addition, Pellaton's Delaware attorney gave an opinion letter to BNY which stated that all the executed

---

**3.** The two other limited partners, Ralph E. McKittrick and Charles A. Oglebay, gave the same guaranties as Pellaton. They are not involved in this proceeding.

**4.** Pellaton also signed a third personal guaranty, a Guaranty of Completion, which is not at issue in this litigation.

loan documents were valid and binding legal instruments.

Pellaton testified that he did not see the settlement documents before the loan closing on May 7, 1987. Pellaton also testified that he signed all of the documents at the loan closing without reading them, based upon the advice from both of his attorneys that those documents had been properly prepared by BNY, in accordance with the terms of its commitment letter. Pellaton testified as follows:

Q. Now, did you review any of these loan documents with your attorney, or with the attorney for the bank, or any representative of the bank before signing them?

A. No, I mean ... excuse me. No.

Q. Why not?

A. I am a developer. I have attorneys, and I close deals, and I pay for my attorneys to review documents, and assume they're all right, and I sign.

Pellaton also testified he had no knowledge that the personal guaranties included warrants to confess judgment.

According to Pellaton, neither his Delaware attorney nor his New York attorney advised him about the legal effect of the confession of judgment provisions. Pellaton's testimony was corroborated by his Delaware attorney, who stated that he did not recall ever explaining the confession of judgment clauses to Pellaton. Pellaton's New York attorney was not deposed and did not testify at the hearing in the Superior Court.

The Superior Court made a factual finding that there was no evidence to refute Pellaton's testimony that he did not read and was not informed about the legal consequences which would follow, in the event of a default, from the confession of judgment clauses in the personal guaranties that he executed. Nevertheless, the Superior Court also found that, under the totality of the circumstances, Pellaton had effectively waived his rights to notice and a

hearing prior to the entry of the judgments against him, by executing the personal guaranties which contained the warrants to confess judgment. However, the Superior Court held that Pellaton's aggregate liability was limited to $1,933,000.00.

### *Validity of Waiver*

*Failure to Read Documents No Defense*

■ "The execution and delivery of a note containing cognovit provisions, waiving the right to prejudgment notice and a hearing, is constitutional if the waiver is knowing, voluntary and intelligent...." *D.H. Overmyer Co., Inc. v. Frick,* 405 U.S. 174, 187, 92 S.Ct. 775, 783, 31 L.Ed.2d 124 (1972). In order for a waiver to be knowing, voluntary and intelligent, it must be "an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 186, 92 S.Ct. at 782 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). The validity of a waiver depends on the totality of the circumstances. *Mazik v. Decision Making, Inc.,* Del.Supr., 449 A.2d 202, 204 (1982) (citing *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023).

Pellaton acknowledges that "the due process rights to notice and a hearing before a civil judgment are subject to waiver." *Id.* (citing *D.H. Overmyer Co., Inc. v. Frick,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).[5] However, according to Pellaton, he did not effectively waive his due process rights because he did not read the loan documents before he signed them. The Superior Court considered the totality of the circumstances and rejected Pellaton's argument:

[I]t is perfectly clear that [Pellaton] had two previous loan commitments from the Bank of New York for the same type of documents. It is also clear that [Pellaton] has been in the real estate [sic] for a number of years, has refinanced and financed the purchase and sale of proper-

---

5. The doctrine of waiver operates in both the civil and criminal contexts. *Mazik v. Decision Making, Inc.,* 449 A.2d at 204 (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964)).

ty, and was even a stockbroker. It is also clear that he was represented by two attorneys at the closing of the mortgage in question. Although he was not informed of the waiver, he had the opportunity to be fully informed of the nature of the transaction, of the documents he was signing, his two attorneys were present. There is nothing more that [BNY] could do to make sure that there was a knowing waiver in the confessed judgments in issue.

"[I]n reviewing the factual findings of a judge sitting without a jury, this Court will uphold such findings if they are sufficiently supported by the record and if they are the product of an orderly and logical deductive process...." *Corrado Bros. v. Twin City Fire Ins. Co.*, Del.Supr., 562 A.2d 1188, 1192 (1989) (citing *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972)). The record reflects that Pellaton accepted the benefits of a $5,800,000.00 loan from BNY and, upon the advice of his two attorneys, executed all of the loan documents which were called for in the BNY commitment letter to secure that debt. Nevertheless, Pellaton argues that because he did not read the loan documents before signing them, and chose instead to rely solely on the advice of his two attorneys, that the waiver of notice and confession of judgment provisions contained within the personal guaranties which he signed should not be given effect.

"If ... [Pellaton's] argument [was] followed to its logical extreme, ... [a contracting party] could radically redefine his [contract] simply by proving that he had not been informed of its stated terms...." *Graham v. State Farm Mut. Auto. Ins. Co.*, Del.Supr., 565 A.2d 908, 912 (1989).[6] However, "[a] party to a contract cannot silently accept its benefits, and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance." *Id.* at 913 (citations omitted). As the United States Supreme Court stated more than one hundred years ago:

That ... [Pellaton] did not read the ... [loan documents], if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

*Upton, Assignee v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875) (citations omitted).

The Superior Court held that, under the totality of the circumstances, Pellaton effectively waived his due process rights to notice and a hearing prior to the entry of a confessed judgment against him pursuant to the terms of both the Guaranty of Debt Service and the Guaranty of Payment. *See Mazik v. Decision Making, Inc.*, 449 A.2d at 205. The Superior Court's factual findings are supported by the record. Its decision to enter both judgments against Pellaton, based upon those findings, is the product of a logical deductive process and is affirmed.

### BNY's Cross-Claim

■ The second issue raised in this appeal is BNY's cross-claim. Pellaton argued in the Superior Court that the terms of the Guaranty of Debt Service and the Guaranty of Payment were ambiguous and, thus, parol evidence was permissible to interpret the meaning of those documents. The Superior Court agreed with Pellaton.

The Superior Court found that the Guaranty of Debt Service and the Guaranty of Payment were ambiguous with respect to the aggregate amount of Pellaton's personal liability. Therefore, the Superior Court admitted parol evidence by Pellaton and his Delaware attorney concerning the intended purpose of those documents. Since both guaranties had been prepared by BNY's

---

**6.** Other jurisdictions have similarly held that a person signing a contract, having the capacity and the opportunity to read its contents, cannot avoid the contract on the ground that he/she signed the contract without reading it. *See* 17A AM.JUR.2D *Contracts* § 224 (1991).

legal counsel, the Superior Court decided that any ambiguity in those documents had to be resolved in favor of Pellaton. The Superior Court held that Pellaton's aggregate personal liability, as provided for in the Guaranty of Debt Service and the Guaranty of Payment, was limited to $1,933,000.00, one-third of the amount of a related mortgage.

In its cross-claim, BNY challenges that decision. BNY argues that the Superior Court should not have admitted parol evidence by Pellaton and his Delaware attorney to construe the two personal guaranties because the provisions of those documents are unambiguous. BNY submits that pursuant to the Guaranty of Debt Service, Pellaton guaranteed the timely payment of the entire monthly interest which was due on the loan, and, in addition, pursuant to the Guaranty of Payment, guaranteed the repayment of $1,933,000.00, approximately one-third of the principal amount of the loan. BNY asserts that the terms of each guaranty expressly provide that Pellaton's aggregate personal liability under both guaranties may exceed $1,933,-000.00.

"The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal." *Klair v. Reese,* Del.Supr., 531 A.2d 219, 222 (1987) (citations omitted). Therefore, this Court must make its own interpretation of the contractual language. *Id.* (citations omitted). When there is uncertainty in the meaning and application of the terms of the contract, this Court, and the trial court, will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract. *Klair v. Reese,* 531 A.2d at 223. However, if the instrument is clear and unambiguous on its face, neither this Court nor the trial court may consider parol evidence "to interpret it or search for the parties' intent[ions]...." *Hibbert v. Hollywood Park, Inc.,* Del. Supr., 457 A.2d 339, 343 (1983). *See Cleveland Trust Co. v. Wilmington Trust Co.,* Del.Supr., 258 A.2d 58, 65 (1969).

The record reflects that the loan documents required the borrower, UMA, to pay interest only on a monthly basis for a period of five years, i.e., no amortization of principal. The Guaranty of Debt Service addressed Pellaton's personal liability in the event that the borrower defaulted on its obligation to make timely monthly payments of interest to BNY. The Guaranty of Payment addressed Pellaton's personal liability in the event that the borrower defaulted on its ultimate obligation to make a timely repayment of the principal amount owed to BNY.

The Guaranty of Debt Service, by which the entire monthly payments of interest to BNY were guaranteed, specifically provides that any personal liability that Pellaton may have under it is in addition to any liability he may have under the Guaranty of Payment:

> The obligation of Guarantor hereunder shall be in addition to, and not in limitation of, Guarantors' obligation under a certain Guaranty of Payment ... of even date herewith from Guarantor to Bank.

The Guaranty of Payment, by which the payment of all other sums (*inter alia* principal) that may become due to BNY were guaranteed, does provide that its liability is limited to $1,933,000.00. However, paragraph 2(b) of the Guaranty of Payment specifically provides that this limitation on liability is independent of any liability Pellaton may have under the separate Guaranty of Debt Service. Paragraph 2(b) of the Guaranty of Payment states:

> (b) Notwithstanding Paragraph 2(a) ..., Guarantor's liability hereunder is limited to $1,933,000.00; provided, however, that the limitations set forth in this subparagraph (b) shall in no way limit, and shall be in addition to, any liability of any Guarantor under a certain Guaranty of Debt Service ... of even date herewith, from Guarantor to Bank.

The record reflects that the provisions of both the Guaranty of Debt Service and the Guaranty of Payment clearly provide for cumulative liability. Therefore, the Superior Court erred, as a matter of law, in admitting parol evidence to vary or contra-

dict the unambiguous provisions of the Guaranty of Payment and the Guaranty of Debt Service. *See Klair v. Reese*, Del. Supr., 531 A.2d 219 (1987); *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339 (1983); *Cleveland Trust Co. v. Wilmington Trust Co.*, Del.Supr., 258 A.2d 58 (1969). Consequently, the Superior Court's holding that Pellaton's aggregate liability on both guaranties was limited to $1,933,-000.00, one-third of the amount of the related mortgage, must be reversed.

## Conclusion

The Superior Court's decision to enter judgments against Pellaton, pursuant to both the Guaranty of Debt Service and the Guaranty of Payment, is AFFIRMED. The Superior Court's decision to limit Pellaton's aggregate liability, in a manner that was contrary to the express terms of those two personal guaranties, is REVERSED. This matter is remanded for further proceedings in accordance with this opinion.