**PLAYTEX FP, INC., formerly known as Playtex Family Products, Inc., a Delaware corporation, Playtex Services Corp., a Delaware corporation; Playtex Family Products Corporation, a Delaware corporation; Playtex FP Group Incorporated, a Delaware corporation; Playtex, Inc., a dissolved Delaware corporation; International Playtex, Inc., a dissolved Delaware corporation, Plaintiffs,**

v.

**COLUMBIA CASUALTY COMPANY, an Illinois corporation; Northwestern National Insurance Company, a Wisconsin corporation; Delaware Insurance Guaranty Association, a non-profit Delaware unincorporated association; National Union Fire Insurance Company, a Pennsylvania corporation; International Insurance Company, an Illinois corporation; AIU Insurance Company, a New York corporation, Defendants,**

v.

**ESMARK, INC., a Delaware corporation; Beatrice Companies, Inc., a Delaware corporation; Coca Cola Bottling Company of San Diego, a California corporation, Counterclaim Defendants.**

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 8, 1991.
Decided: Dec. 9, 1991.

---

Walter L. Pepperman, II, James Lawless, IV, Morris, Nichols, Arsht & Tunnell, Wilmington, and William J. McSherry, Jr., Battle Fowler, New York City, and Robert N. Sayler, Covington and Burling, Washington, D.C., and Stephen D. Chakwin, Jr., Playtex, Inc., Stamford, Conn., for plaintiffs.

Irving Morris, Morris and Morris, and Kevin Gross, Rosenthal, Monhait & Gross, P.A., Wilmington, and William H. Briggs, Jr., Rebecca L. Ross, Washington, D.C., Ross, Dixon & Masback, and Julian C. Campbell, Jr., Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant Columbia Cas. Co.

Howard M. Berg, Berg, Bifferato, Tighe & Cottrell, P.A., Wilmington, and Jeffrey J. Bouslog, Oppenheimer, Wolff and Donnelly, St. Paul, Minn., for defendant International Ins. Co., AIU Ins. Co. and Nat. Union Fire Ins. Co.

Stephen P. Casarino, Casarino, Christman & Shalk, Wilmington, and Dion J. Sartorio, Tribler & Orpett, P.C., Chicago, Ill., for defendant Northwestern Nat. Ins. Co.

Nancy E. Chrissinger, Tybout, Redfearn, & Pell, Wilmington, for Delaware Ins. Guar. Ass'n.

Gerald G. Saltarelli, Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, Ill., for counterclaim defendants Esmark, Inc., and Beatrice Companies, Inc.

## OPINION

DEL PESCO, Judge.

Playtex brought this action against Columbia and other of its insurers to recover amounts paid in settlement of certain toxic shock syndrome ("TSS") claims. This deci-

sion will determine the attachment points for coverage under the Esmark insurance program for 1984–85, under which Playtex was an insured subsidiary.[1] Esmark contends that the lead umbrella coverage attaches after a self-insured retention of $1 million dollars per occurrence with a $7 million dollar aggregate which is articulated by a primary insurance policy issued by Northwestern. Columbia, on the other hand, contends that the $1 million dollar deductible endorsement signed by Esmark is a part of the Northwestern policy and creates a "maintenance deductible" which adds an unaggregated $1 million dollar per occurrence deductible to the Esmark self-insured retention. Under Columbia's interpretation, the lead umbrella coverage attaches after Esmark has paid the $1 million dollar unaggregated deductible plus $1 million dollars per occurrence subject to a $7 million dollar aggregate.

After a five-day hearing held October 21–25, 1991,[2] and review of selected deposition testimony, pre and post-trial briefs and memoranda, and trial exhibits, I conclude that the deductible endorsement is not a part of the Esmark umbrella insurance program, and therefore the lead umbrella coverage attaches above $1 million dollars per occurrence, $7 million dollars in the aggregate.

## I. INTRODUCTION

The Esmark insurance program for 1984–85 consisted of the Northwestern primary policy, the Mission lead umbrella policy, the Columbia first layer excess umbrella policy, and other excess carriers above Columbia. When Columbia became an excess carrier in Esmark's insurance program for October 1, 1984 through October 1, 1985, it was participating in an insurance program which had, with minor changes, been followed throughout the early 1980s. Esmark's policy was to "transfer catastrophic risk to financially capable third parties." Jt.Ex. 14[3], at Z004342.[4]

On March 1, 1979, Dinner Levison, which was acquired by Fred S. James ("James") in October of 1984, was appointed as Esmark's broker. They replaced another brokerage firm, Youngberg, Carlson, which already had an insurance program in place consisting of a primary placement that had a fronting program, a lead umbrella program, and an excess program above the lead umbrella. Stein T. p. 30 (Oct. 23). This basic structure continued to be followed by Esmark through the early 1980s, and was used in the 1984–85 policies.

Columbia became a new excess insurer in the Esmark program for the 1984–85 policy year as a result of Esmark's re-marketing of the program. Esmark had decided to re-market its program in response to changes in the insurance industry. According to Phil Stein ("Stein"), the broker from James handling the Esmark placement, 1984 was a transitional year in the insurance market. Consequently, Esmark's representatives felt that they had to get themselves into the market earlier that year. Stein T. pp. 56–57 (Oct. 23).

Graves D. Hewitt ("Hewitt"), Columbia's expert, described the 1984 market and the events that influenced it. In 1978, the ex-

1. For simplicity, this opinion will refer to "Esmark's" position rather than stating each time that it is the position of Playtex.

2. Transcripts from the hearing will be designated with the letter "T" and identified by the witness' name, the appropriate page number and the date of the witnesses testimony.

3. "Jt.Ex. ——" refers to the Joint Exhibits admitted in evidence at the October 21–25 hearing.

4. Robert Finney, Esmark's Risk Manager when the 1984–85 policies were purchased and an employee in Esmark's and later Beatrice's risk management department from April, 1982 through June, 1986, defined two kinds of risk that he considered catastrophic: (1) severe shock loss resulting from one particular incident producing a loss in excess of that projected plus cushion of loss; (2) frequency losses. Finney explained that in the food and personal products business a product problem could have a severe impact on the earning statement leading to financial trouble and a reduction in the stock price. Finney T. p. 81 (Oct. 21). Graves D. Hewitt, Columbia's expert, disagreed with Finney, stating that "catastrophic" is defined in the insurance industry as both great and sudden, meaning that catastrophic coverage would apply to a single large claim, not a series of small ones. Hewitt T. p. 79 (Oct. 25).

cess and surplus segment of the insurance industry had a "golden year." This attracted more insurers and re-insurers into the business. Hewitt T. pp. 69–70 (Oct. 25). "[T]he capacity for excess and surplus lines placements mushroomed." *Id.* at 70. As the capacity increased, there was pressure to lower prices in order to retain market share. In 1980, rates in the excess and surplus market went down 20%. The same thing happened in 1981, 1982 and 1983. By the end of 1983 the re-insurers, who got a smaller percentage of the premium than the primary insurance companies did, were feeling the effect of the rate cutting. *Id.* As the capacity for excess and surplus insurance shrank, it became difficult to complete placements for large insurance programs.

Esmark's insurance program was affected by the changes in the excess and surplus market in 1984. Mission had historically provided $10 million dollars of lead umbrella coverage. Half of that had been reinsured, but that reinsurance was not available for the 1984–85 policy year. Finney T. p. 88 (Oct. 21). Due to the loss of its reinsurance and the changing market, Mission quoted a price for $5 million dollars of coverage for the 1984–85 policy year which was higher than that charged for the $10 million dollars of coverage provided the year before. *Id.* at 89.

According to Robert Finney ("Finney") the tightening market was not the only problem for Esmark in the 1984–85 placement process. Since Esmark was being acquired by Beatrice, there were insurers who did not want to get involved in underwriting the Esmark program only to lose the business to Beatrice's insurers. *Id.* at 95.

Esmark began efforts to place insurance for 1984–85 in April of 1984. *Id.* at 86. In June of 1984 liability specifications (Jt.Ex. 14) were sent out to potential markets. *Id.*

at 92. Stein and Finney met with all the prospective lead umbrella underwriters.

Columbia Casualty was considered to provide the lead umbrella policy. Columbia's underwriter, Richard White ("White"), reviewed materials regarding the Esmark insurance program,[5] and on July 20, 1984 White, Noel W. Prather ("Prather"), President of Columbia Casualty, Stein and Finney met in Columbia's offices in Chicago to discuss the lead umbrella policy. After being introduced to Stein and Finney by Prather, White conducted the meeting with them in his office.

According to Finney, there were three reasons for meeting with prospective underwriters personally. The first purpose of the meeting with Columbia was to meet each other and get to know who the underwriter would be as well as give the underwriter a chance to meet Esmark's risk manager and broker. The second purpose was to discuss the existing program and Esmark's philosophy on retention and risk transfer. The third purpose was to describe Esmark, since it was a conglomerate of several different companies, and to walk the underwriter through the specifications so he would understand the information presented and so they could answer any questions. Finney T. pp. 102–103 (Oct. 21).

On August 3, 1984, White called Stein and offered to write the lead umbrella policy. White's quote was for limits of $2 million per occurrence subject to an $8 million aggregate, and would have required Esmark to make several changes to the proposed policy form. Stein rejected the Columbia offer over the telephone on August 13, 1984, and invited a bid on the first layer excess umbrella. White then made a first layer excess offer which was accepted by Esmark.

When the program was fully placed for 1984–85, there was a primary policy issued by Northwestern with limits of $1 million

---

5. Before meeting with Columbia's representatives, Esmark sent the following materials to Noel W. Prather, Columbia's President: (1) a binder of insurance specifications which described Esmark and the business of its subsidiaries and their various risk exposures; (2) a copy of a proposed form of lead umbrella policy

which was essentially the Mission form with the premium and per occurrence and aggregate retentions and policy limits left blank; and (3) a 2½ page "lead umbrella desired program memorandum" which described Esmark's needs in a lead umbrella. These documents are included in Jt.Ex. 25. Stein T. pp. 79–81 (Oct. 23).

dollars per occurrence subject to a $7 million dollar aggregate, a lead umbrella policy issued by Mission with limits of $5 million dollars per occurrence subject to a $5 million dollar aggregate, a first layer excess policy issued by Columbia with limits of $10 million dollars per occurrence subject to a $10 million dollar aggregate, and several layers of excess policies above Columbia. The entire program involved $200 million dollars of coverage.

Columbia acknowledges that the Northwestern insuring arrangement with Esmark was a non-risk transfer or "fronting" arrangement. A fronting arrangement was necessary to effectuate Esmark's desire to self-insure a portion of its coverage. Fronting policies have no risk transfer associated with them. Large companies use fronting policies to comply with statutory filing requirements, and for business purposes such as leasing property or equipment and satisfying vendors' requirements for insurance coverage. Finney T. p. 82 (Oct. 21).

On July 27, 1981 Northwestern reviewed Esmark's underwriting information and proposed a fronting program to Esmark through Dinner Levison. Northwestern was in the business of selling fronting programs. It helped large insureds with self-insurance type mechanisms such as captive fronting arrangements, matching deductible or large deductible programs, and some self-insurance programs. Weber T. pp. 253–254 (Oct. 21). Stein testified that the fronting concept was defined by Esmark in the marketing of its insurance program as an articulation of Esmark's self-insured retention, and stated that "Northwestern described their program as a deductible equals limits program." Stein T. p. 33 (Oct. 23). According to Stein, the understanding between Northwestern and Esmark was that there would not be any

risk transfer except if Esmark were to be insolvent. *Id.* at 36.

The effective date of Northwestern's first policy for Esmark (CLA 228313) was October 1, 1981. Northwestern renewed its fronting policies for 1982–83, 1983–84, and 1984–85. In 1985 Northwestern got out of the fronting business and sold the right to their renewal business. Weber T. p. 257 (Oct. 21).

There is no common way of effectuating fronting policies. Hewitt T. p. 52 (Oct. 25). Deductible equals limits policies are one method. Esmark contends that the Northwestern fronting policy was accomplished with the use of two documents: a hold harmless agreement [6] and a deductible endorsement. The hold harmless agreement said there would be no losses reported under the policy, and if there were, Esmark would have to reimburse Northwestern for all its expenses. Finney T. p. 84 (Oct. 21). Under the deductible endorsement there was no risk transferred to the insurance carrier, as the deductible was to become part of the fronting policy and equal the limits. *Id.* at 85; Weber T. p. 9 (Oct. 21).[7]

Columbia contends that Esmark had a $1 million per occurrence self-insured retention in addition to the $1 million per occurrence, $7 million aggregate limits of the Northwestern fronting policy, so $2 million would have to be paid by Esmark for any single occurrence before the lead umbrella layer would be invaded. Since most of the toxic shock syndrome (TSS) claims in the 1984–85 policy year were settled for less than $1 million, Columbia's interpretation would result in little or no coverage for Playtex under the Esmark insurance program.

## II. INTERPRETING THE POLICY

The first step in interpreting an insurance contract is the determination of

---

6. Dr. Joseph A. Fields (Fields), a second Columbia expert, testified that fronting arrangements are often done under a captive reinsurance agreement when the front is needed to secure a certificate of insurance for a regulatory or contractual purpose. Hold harmless agreements are used to make policies into fronts, typically

when the insured has credit problems. Fields T. p. 125 (Oct. 24).

7. According to Hewitt, one should be careful with deductible wording, because deductibles typically reduce loss, not limits. Hewitt T. p. 54 (Oct. 25).

whether the contract is ambiguous. A contract is ambiguous when its language allows for two or more reasonable interpretations. *Hallowell v. State Farm Mutual Auto. Ins. Co.*, Del.Supr., 443 A.2d 925, 926 (1982). Where the language of the contract is clear and unambiguous, the parties shall be bound by the plain meaning of the language. *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473 (1991). Creating an ambiguity where none exists could result in the creation of a new contract by the court with terms to which the parties had not assented. *Id.* In *Playtex v. Columbia*, 1991 WL 138374 Del.Super., C.A. No. 88C–MR–233, Del Pesco, J. (July 9, 1991), I concluded that the provisions of the insurance policy were ambiguous.[8]

The next step in the analysis is to determine what rule of interpretation to follow. There are three methods of interpretation which may be applied to determine the meaning of the provisions of an insurance policy. They are 1) the doctrine of reasonable expectations; 2) the rule of contra proferentem; and 3) the evaluation of extrinsic evidence to determine the intent of the parties.

 The plaintiff urges the Court to apply the doctrine of reasonable expectations to the interpretation of this insurance contract. Insurance contracts have long been interpreted by Delaware courts as contracts of adhesion which should be "read to accord with the reasonable expectations of the purchaser so far as its language will permit." *State Farm Mutual Automobile Ins. Co. v. Johnson*, Del.Supr., 320 A.2d 345, 347 (1974). The doctrine of reasonable expectations developed to protect the expectations of consumers who, without the opportunity for negotiation, purchased insurance policies which were drafted by the insurer. *Hallowell*, 443 A.2d at 926. In this case, the consumer was Esmark, a large corporation which had a sophisticated risk management department and an impressive list of risk management consultants. The policy at issue was drafted by Esmark's brokerage firm, Dinner Levison as succeeded by James, and presented as a manuscript form to potential lead umbrella insurers. Contract provisions were then negotiated with the insurers.[9] Because this was a negotiated contract, not a contract of adhesion, the doctrine of reasonable expectations is not applicable.

 Where the language of a contract is ambiguous, *contra proferentem* requires that the language be construed against the party who chose the language used. *Hallowell*, 443 A.2d at 926; *Hudson v. D & V Mason Contractors, Inc.*, Del.Super, 252 A.2d 166, 168 (1969); *Goodman v. Continental Casualty Co.*, Del.Super., 347 A.2d 662, 665 (1975). I agree with the practice of jurisdictions which use *contra proferentem* only where the intent of the parties cannot be determined with the use of extrinsic evidence. *See Southern Maryland Agricultural Association v. Bituminous Casualty Corp.*, D.Md., 539 F.Supp. 1295, 1299 (1982) (Should the ambiguity not be resolved by resort to evidence of the parties' intent and trade usage, the policy is construed against the insurer as the par-

---

**8.** In the case of *Coca Cola Bottling Company of San Diego v. Columbia Casualty Insurance Company, et al.*, Cal.Super., No. 601969, Pate, J. (Mar. 2, 1990), the trial judge granted plaintiffs' motion for a judgment of dismissal on the issue of Northwestern's deductible endorsement. *Coca–Cola*, like *Playtex*, was an insured under the Esmark 1984–85 insurance program. The *Coca–Cola* claim arose from an automobile accident, consequently the Mission policy, Limits of Liability section C, applied, rather than section B which applies to the T.S.S. claims.

The California Court of Appeals, Fourth Appellate District, Division One, reviewed the decision of the Superior Court of San Diego County. In reversing the trial court, the appellate court noted:

In this respect this case is not extraordinary. Northwestern Policy No. CLA255714 is by no means unambiguous as Northwestern contends. More a vehicle for Jesuitical or Talmudic debate than a definition of the rights and obligations of the parties to the contract, the policy crosses one's eyes and boggles one's mind. *Columbia Casualty Co. v. Northwestern National Insurance Co.*, 231 Cal. App.3d 457, 282 Cal.Rptr. 389, 396 (1991).

**9.** In his deposition, John M. Brough, former Vice President of Mission, stated that a manuscript form is not normally a contract of adhesion, but involves negotiation between the parties. John M. Brough deposition, December 11, 1989, pp. 30, 51.

ty which drafted the agreement, and in favor of coverage for the insured.); *Rainier Credit Co. v. Western Alliance Corp.*, 171 Cal.App.3d 255, 217 Cal.Rptr. 291, 295 (1985) ("This rule is to be used only when there is no extrinsic evidence available to aid in the interpretation of the contract or where the uncertainty cannot be remedied by other rules of interpretation.")

Because of the nature of the contract development in this case and the unique character of the Esmark insurance program, the next step in the analysis is the evaluation of extrinsic evidence to determine the intent of the parties in accordance with the Delaware Supreme Court's decision in *Klair v. Reese*, 531 A.2d 219, 223 (1987).

> In interpreting an integrated agreement, attention is directed to the meaning of the written terms in light of the surrounding circumstances ... As long as the court is aware that doubts and uncertainty lurk in the meaning and application of agreed language, it will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the issue.

■ Esmark argues that its intent and that of Mission, not the intent of Esmark and Columbia, should be determined in this case, and that Columbia, as an excess insurer who followed form to the Mission policy, should be bound to Mission's intent. It is true that excess insurers who follow form are generally held to the intent of the primary insurer. *See L.E. Myers Co. v. Harbor Ins. Co.*, 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (1979) (excess insurer who followed form to underlying policy without reading it bound by reformation of the underlying policy to remedy underlying parties' mistake of fact); *Ford Motor Co. v. Northbrook Ins. Co.*, 6th Cir., 838 F.2d 829 (1988) (Court looked at intent of parties to underlyer in determining obligations of follow form excess insurers); *Great Atlantic Ins. Co. v. Liberty Mutual Ins. Co.*, 8th Cir., 773 F.2d 976 (1985) (reformation of clerical error in underlying insurance policy allowed where reformation worked to the detriment of follow form excess insurers);

*Carey Canada, Inc. v. Columbia Cas. Co.*, D.C.Cir., 940 F.2d 1548, 1559 (1991) (appellate court remanded case for lower court to ascertain whether excess policy's follow form provisions mean that its liability is "inextricably tethered to that of the insurer whose form it followed").

According to Hewitt the typical excess insurer would give a quote on a policy knowing only that there was an insurance program in place and the identity of the lead umbrella carrier and other carriers who were already committed to the program and their limits. The excess insurers relied on the fact that the lead umbrella carrier had met with the insured and had determined that the program was sound, and based on that knowledge issued an excess policy without seeing the underlying policy. Hewitt also testified that the "business was one based on trust and rapport, and ... it was the expectation of the parties that the representations and agreements, whether they had been written or oral, would be incorporated in that policy's wording." Hewitt, T. p. 41 (Oct. 25).

Unlike most excess insurers, Columbia met at length with Esmark's representatives regarding the Esmark insurance program while being considered as a potential lead umbrella carrier. After Columbia's bid for the lead umbrella policy was rejected, Esmark accepted Columbia's bid for the first layer excess umbrella. Columbia would like for this Court to consider the intent of Columbia and Esmark which arose in the context of lead umbrella negotiations in interpreting the attachment point of Columbia's excess policy.

Considering Columbia's intent to determine the attachment point of its excess policy would be inappropriate and destructive to the Esmark insurance program. Although Columbia was privy to information regarding Esmark's desired lead umbrella policy, each carrier which was being considered for the lead umbrella policy had an opportunity to negotiate with Esmark, so there was no guarantee that the resulting policy would resemble that which White discussed with Finney and Stein.

Mission like all other carriers under consideration had the opportunity to negotiate changes to the lead umbrella policy. Changes in the insurance program were subject to adjustment with each annual renewal. Even in the firmer market of the early 1980's the per occurrence and aggregate limits at which Mission attached had changed through time:

MISSION ATTACHMENT POINTS

| Year | Per Occurrence | Aggregate Limit |
|---|---|---|
| 1981–82 | 2,000,000 | 4,000,000 |
| 1982–83 | 1,000,000 | 4,000,000 |
| 1983–84 | 1,000,000 | 7,000,000 |

Columbia chose to follow form to Mission's lead umbrella. If excess umbrella carriers were allowed to challenge their attachment points based on their own intent, it would be impossible to create a cohesive insurance program where one layer ended leading smoothly into the next. *See Monsanto Co. v. American Centennial Ins. Co.*, 1991 WL 35714, Del.Super., C.A. No. 87C–NO–11, Poppiti, J. (Feb. 20, 1991); Hewitt T. p. 113 (Oct. 25).

As a follow form excess carrier who did not negotiate specific exclusions to the form, Columbia is bound by the intent of the parties to the lead umbrella, Mission and Esmark.

 With *Klair* in mind, the analysis of the various policies begins with a review of the significant provisions of the Northwestern and Mission policies as follows:

The Northwestern primary policy contains the following endorsements:

COMBINED SINGLE LIMIT ENDORSEMENT

It is agreed "Limits of Liability" ... are hereby deleted and the following substituted therefor:

\* \* \* \* \* \*

2. $7,000,000 in the aggregate during this annual period with respect to ultimate net loss for bodily injury, personal injury and property damage arising out of Toxic Shock Syndrome occurrences.

ULTIMATE NET LOSS ENDORSEMENT

IT IS HEREBY AGREED DEFINITIONS, THE FOLLOWING DEFINITION OF "ULTIMATE NET LOSS" IS ADDED TO ALL POLICY COVERAGE PARTS OF THE POLICY:

THE TERM "ULTIMATE NET LOSS" MEANS THE TOTAL SUM WHICH THE INSURED, OR ANY COMPANY AS HIS INSURER OR BOTH, PAYS AS A CONSEQUENCE OF ANY OCCURRENCE COVERED HEREUNDER, INCLUDING OBLIGATIONS TO PAY BY REASON OF PERSONAL INJURY, BODILY INJURY, PROPERTY DAMAGE, OR ADVERTISING LIABILITY, EITHER THROUGH ADJUDICATION OR COMPROMISE, AND REGARDLESS OF THE FINAL OUTCOME OF ANY JUDGMENT, ADJUDICATION, COMPROMISE, OR SETTLEMENT, SHALL ALSO INCLUDE HOSPITAL, MEDICAL AND FUNERAL CHARGES AND ALL SUMS PAID AS SALARIES, ... ADJUSTMENT AND INVESTIGATION OF CLAIMS AND SUITES [SIC] WHICH ARE PAID AS A CONSEQUENCE OF ANY OCCURRENCE COVERED HEREUNDER, EXCLUDING ONLY THE SALARIES OF THE INSURED'S PERMANENT EMPLOYEES

At issue in this case is whether or not the Northwestern primary policy also contains the deductible endorsement which provides as follows:

IN CONSIDERATION OF THE PREMIUM CHARGED AND THE ISSUANCE OF POLICY # CLA 255714, ISSUED BY NORTHWESTERN NATIONAL INSURANCE COMPANY, IT IS AGREED THAT $1,000,000 SHALL BE DEDUCTED FROM THE AMOUNT OF ANY LOSS, INCLUDING DEFENSE COVERAGE, AS A RESULT OF EACH OCCURRENCE REPORTED UNDER THIS POLICY.

Accepted by: ESMARK, INC.
By Robert D. Finney
Title: Risk Manager
Date: 2/4/86

The Mission lead umbrella policy is structured as follows:

*I. INSURING AGREEMENTS*

*COVERAGE A:* THE COMPANY WILL INDEMNIFY THE INSURED FOR ULTIMATE NET LOSS IN EXCESS OF THE TOTAL APPLICABLE LIMITS OF LIABILITY OF UNDERLYING INSURANCE SET FORTH UNDER SCHEDULE A ... WITH RESPECT TO COVERAGE A, THE PROVISIONS OF ALL UNDERLYING POLICIES ARE INCORPORATED AS A PART OF THIS POLICY, EXCEPT ... THE AMOUNTS OF THE LIMITS OF LIABILITY ... AS TO ULTIMATE NET LOSS NOT COVERED BY UNDERLYING INSURANCE SET FORTH UNDER SCHEDULE A ... COVERAGE B APPLIES.

*COVERAGE B:* AS TO ULTIMATE NET LOSS NOT COVERED BY UNDERLYING INSURANCE SET FORTH UNDER SCHEDULE A ... COMPANY HEREBY AGREES, SUBJECT TO THE LIMITATIONS, TERMS AND CONDITIONS HEREINAFTER MENTIONED, TO INDEMNIFY THE INSURED FOR ALL SUMS WHICH THE INSURED SHALL BE OBLIGATED TO PAY ...

\* \* \* \* \* \*

*II. EXCLUSIONS:*

\* \* \* \* \* \*

*III. LIMITS OF LIABILITY*

\* \* \* \* \* \*

B. WITH RESPECT TO ULTIMATE NET LOSS ARISING OUT OF TOXIC SHOCK SYNDROME:

THE COMPANY SHALL BE LIABLE FOR $5,000,000 ULTIMATE NET LOSS EACH OCCURRENCE ... NOT TO EXCEED $5,000,000 ULTIMATE NET LOSS IN THE AGGREGATE FOR EACH ANNUAL PERIOD DURING THE CURRENCY OF THIS POLICY IN EXCESS OF:

(1) THE AMOUNT RECOVERABLE UNDER THE UNDERLYING INSURANCE SET FORTH UNDER SCHEDULE A ... OR

(2) UNDER COVERAGE B, SELF-INSURED RETAINED LIMIT OF $1,000,000 ULTIMATE NET LOSS EACH OCCURRENCE ... NOT COVERED BY UNDERLYING INSURANCE SET OUT IN SCHEDULE A....

ALL SUCH AMOUNTS AND/OR RETAINED LIMITS ARE SUBJECT TO A MAXIMUM OF $7,000,000 ULTIMATE NET LOSS IN THE AGGREGATE FOR EACH ANNUAL PERIOD DURING THE CURRENCY OF THIS POLICY UNDER III B(1) AND III B(2) ABOVE. (THIS AGGREGATE PROVISION WITH RESPECT TO III B(1) APPLIES ONLY TO THE FOLLOWING POLICY(IES) UNDER SCHEDULE A:

NORTHWESTERN NATIONAL INSURANCE COMPANY COMPREHENSIVE GENERAL AND AUTO LIABILITY POLICY NO. CLA 255714

Esmark argues that the deductible endorsement was not intended to be and is not a part of the Mission lead umbrella policy. It argues that the Mission policy attaches at $1 million dollars "ground up" [10] per occurrence and after payment of the $7 million dollar aggregate. Alternatively, Esmark argues that if the deductible endorsement is in the policy, the language of the policies demonstrate that the monies paid pursuant to the deductible are part of ultimate net loss, as defined in the Northwestern primary policy, and thus are part of the aggregate of $7 million dollars over which the Mission policy attaches.

Esmark relies on the definition of ultimate net loss which "MEANS THE TOTAL SUM WHICH THE INSURED, OR ANY COMPANY AS HIS INSURER OR BOTH, PAYS AS A CONSEQUENCE OF ANY OCCURRENCE ..." It then argues that in accordance with the definition of Ultimate Net loss, when the *insured* or Northwestern has paid $7 million dollars of ultimate

---

**10.** The term "ground up" is a useful description of all monies needed to pay the *claim*, regardless of who pays.

net loss, Northwestern has no more liability under its policy. Esmark also notes that the hold harmless agreement also provides that Northwestern's liability ends when ultimate net loss has been paid, and does *not* specify that the payment has to be made by Northwestern.[11]

Esmark argues that the LIMITS OF LIABILITY language in the INSURING AGREEMENTS portion of the policy is properly read to mean that the deductible endorsement is *not* a part of the Mission policy because the attachment point of the Northwestern policy is effected by the presence of the deductible.

Esmark argues that Limits of Liability III B(1) and (2) should be read together so that the "amount recoverable" under B(1) and the "self-insured retained limit" under B(2) are combined to equal the "amounts and/or retained limits ... subject to a maximum of $7,000,000 ultimate net loss in the aggregate for each annual period ..." under the paragraph that follows. Thus, monies paid pursuant to the deductible endorsement would be part of the $7 million dollar aggregate. Barber, Oct. 25, 1991, p. 170–171.

Columbia argues that the Mission lead umbrella policy attaches over $2 million dollars ground up, which is composed of a $1 million dollar deductible and the self-insured retention represented by the Northwestern policy, which results in the payment by Esmark of a second $1 million dollars because of the hold harmless agreement.[12] Columbia argues that the deductible endorsement is incorporated into the Mission policy and that payments pursuant to the deductible are not part of the Northwestern aggregate. It bases its position on the language of the deductible endorsement which provides that "$1,000,000 shall be deducted from the amount of any loss." Deduction from the loss as opposed to deduction from the limits of liability requires Esmark to pay the first $1 million dollars of each claim made within the policy period, without aggregation. Columbia argues that only a single claim/occurrence which exceeds $2 million dollars in value would reach the Mission policy because the first $1 million dollars is paid through the deductible and the second $1 million dollars is paid as part of the underlyer. The first $1 million dollars does not aggregate; the second $1 million would. Therefore, if the first claim of the year were $10 million dollars, the first million would be paid pursuant to the deductible, the second million would be paid by the Northwestern policy, the third through seventh million would be paid by Mission and the eighth through tenth would be paid by Columbia.

I accept Columbia's argument with regard to the workings of the various policies; that is, I find that a deductible in the Northwestern policy would become a part of the Mission and Columbia policies. I accept the testimony of Fields, who explained that the deductible such as the one in this case is a "straight deductible" which, by its own terms, reduces the amount of *loss*. By contrast, a deductible

---

11. *HOLD HARMLESS AGREEMENT*

In consideration of Northwestern National Insurance Company and/or any or all of its subsidiary or associated companies ("Northwestern") issuing policies or other evidence of an assurance, as per the attached Schedule A, Esmark, Inc. hereby agrees that no loss will be reported under any of the scheduled policies or other evidence of insurance or any replacements or renewals thereof. If a loss should be reported, Esmark, Inc. agrees to indemnify and reimburse Northwestern for any and all losses and/or expenses paid on account of such loss except for any and all losses that may occur as a result of any negligent or willful and wanton act of commission or omission of Northwestern.

It is further agreed that Esmark, Inc. will indemnify Northwestern for any and all losses and/or expenses that may occur, under these scheduled policies or other evidence of insurance, as a result of a suit or other action brought directly against Northwestern except for any and all losses that may occur as a result of any negligent or willful and wanton act of commission or omission of Northwestern.

12. Fields explained that the Northwestern policy is not a fronting *policy* because the policy does not contain a provision that would effectuate a front. Instead the Northwestern policy is a primary insurance policy which is part of a fronting *arrangement* whereby the front is created through a hold harmless provision, a side agreement. Fields T. pp. 121–122 (Oct. 24).

from *limits* reduces the per occurrence limits of the policy. Fields T. p. 116 (Oct. 24). A deductible endorsement with the language used in this case would result in a non-aggregating reduction of up to $1 million dollars for each loss. Fields also testified and I find that the ultimate net loss provision would not change that result nor would the "limits of liability" language of the INSURING AGREEMENTS be properly construed to "except" or exclude a deductible. I accept Fields' explanation that payments made pursuant to such a deductible would not be "amount[s] recoverable" under III B(1) of the limits of liability.[13]

Notwithstanding the above, I conclude that the deductible endorsement executed by Finney in 1986 was *not* a part of the Northwestern policy for purposes of the insurance program with Mission, Columbia, and carriers above them.[14] Incorporation of the deductible endorsement in the other policies was unequivocally not the intent of Esmark, Northwestern or Mission and I conclude it was not a part of the program in which Columbia undertook to provide excess umbrella coverage.

This case does not turn on an intricate examination of the policy language. One of the few uncontroverted aspects of this case is the testimony from Stein, Finney, White and Hewitt that a true understanding of the program sought and the offer made must come from the conversation between the broker (in this case, the broker and the insured) and the underwriter. That's where the fact issue arises.

Under the modern view, the court must consider the statements of the parties concerning the meaning of the writing as well as evidence such as trade usage or course of dealing ... *Klair v. Reese*, 531 A.2d 219, 223 (1987).

The intent of the parties to the Northwestern and Mission policies is relevant to the determination of whether the deductible endorsement applies to the Mission policy and therefore affects the attachment points of all the policies. According to Esmark, whose position I accept, the structure of the deal depended on whether the lead umbrella carrier (which turned out to be Mission again in 1984–85) would attach at $5 million, $7 million or some other point. Esmark would retain coverage below the lead umbrella carrier, through a fronting arrangement. The higher the attachment point of the lead umbrella carrier, the more risk Esmark assumed since the fronting arrangement was intended not to transfer risk unless, of course, Esmark became insolvent.

Testifying on behalf of Esmark, Finney and Stein both testified they told prospective underwriters that the fronting policy was "an articulation of Esmark's self-insured retention." They testified to the same language and explained their certainty as the result of hundreds of meetings which they had through the years explaining the type of coverage Esmark was seeking. They testified that under the hold harmless agreement, there were to be no claims made against the Northwestern policy, and that the deductible endorsement

---

**13.** There has been much discussion of coverage A & B under this insurance program. I accept the testimony of Fields and find the whole matter to be irrelevant to the issue before me.

 Q Can you tell the Court what the difference is between coverage A and coverage B?

 A Yes. Coverage A is a coverage which is provided where there is an underlier. Coverage B there is no underlier. Generally what you're trying to accomplish in an umbrella is you're trying to get all of the risk under coverage A and none of the risk under coverage B. The idea of coverage B is to try to make sure that in case you forget something that there would be coverage and there wouldn't simply be an accident because your underlying policy didn't cover some particular item that you had forgotten. Fields T. p. 136 (Oct. 24).

**14.** Fields explained that using deductible endorsements to create a fronting arrangement generally isn't seen. He explained:

 And the reason is that there are significant problems using [a deductible equals limits] clause ... the problem is ... you are changing part of a document where a lot of things are interpreted as a whole.

 For example, you may forget to turn off the deductible endorsement as part of a followed form. Fields T. p. 124 (Oct. 24).

Failure to "turn off" the deductible, i.e. to clearly limit it to the fronting arrangement with Northwestern, is precisely the reason this dispute has arisen.

was to protect Northwestern in the event that a claim should be made. Neither of them believed the deductible endorsement to be applicable to any of the policies above Northwestern. Their presentations were apparently understood by Northwestern and Mission as both acknowledge that the coverage they provided was consistent with the expectations of Esmark, a fronting arrangement whereby Esmark would pay $1 million per occurrence with a $7 million dollar aggregate.[15]

Weber, the underwriter for Northwestern, testified that he considered the policy to be a fronting policy, and also testified that the deductible endorsement was included for Northwestern's protection in case a third party made a claim against the policy. Weber stated that if he were asked for a copy of the policy he would include a copy of the deductible endorsement, but that he did not intend for the deductible endorsement to affect the attachment points above the Northwestern policy. The intent that the deductible endorsement only be a protective measure for Northwestern is bolstered by the casual attention it received. The deductible endorsement was not signed by Esmark until February 4, 1986, which was more than four months after the Northwestern policy had expired, and Weber testified that he did not know if the deductible endorsement for the 1983–84 policy year had ever been signed.

Mission shared Esmark's and Northwestern's intent regarding attachment points. Except for the limits of liability, the Mission lead umbrella policy remained relatively unchanged from 1981 to 1985. Mr. Harvey W. Goldenberg, the Mission underwriter, testified in his deposition regarding the attachment points of the 1983–84 policy:

Q. Tell me how, in your words, the 1 million dollar per occurrence limit and the 7 million dollar aggregate limit worked together, if they did?

A. The insured was obligated to pay the first million dollars of any claim. But after they had paid 7 million dollars of—pertaining to toxic shock only now, after they paid 7 million dollars in toxic shock claims, then Mission would start their payment. Harvey W. Goldenberg deposition, December 14, 1991, p. 180.

Although these comments refer to the 1983–84 policy year, the absence of any change in the policy justifies an inference that Mission's intent as to the attachment points was unchanged in the 1984–85 policy year. The introduction of an unaggregated $1 million dollar deductible below the attachment points described by Goldenberg would be an enormous change in Esmark's umbrella program. There is no evidence that the intent of the parties for the 1984–85 policy year included such a major change in the coverage.

The parties' actions also indicate an intent consistent with that of Esmark. Consistent with Playtex's interpretation of the attachment points to the policies, claims have been indemnified by carriers in the Esmark insurance program.

## III. CONCLUSION

I find that the intent of Esmark, Northwestern and Mission was for the Northwestern policy to be an articulation of Esmark's self-insured retention. Therefore the Mission policy attaches after Esmark has paid $1 million per occurrence to an aggregate of $7 million for toxic shock losses.

IT IS ORDERED that judgment is entered in favor of Playtex on the attachment point for the Mission lead umbrella policy.

---

**15.** Although I have concluded that Columbia's intent has no relevance to this decision and I expressly do not rule regarding Columbia's intent, it is significant that White had *no* knowledge of the existence of the deductible endorse-ment until March of 1988. White T. p. 112 (Oct. 22).