**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

April 30, 2021

Jeffrey L. Moyer, Esquire
Steven J. Fineman, Esquire
Jason J. Rawnsley, Esquire
Christine D. Haynes, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Thomas A. Uebler, Esquire
Joseph L. Christensen, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Re:     *UBEO Holdings, LLC et al. v. Drakulic,* C.A. No. 2020-0669-KSJM

Dear Counsel:

This court frequently issues letter opinions where the decision carries little precedential value and speaks only to issues relevant to the parties. The issue addressed in this letter calls for such an approach.

In 2018, a California-based copier and printer company, Ray A. Morgan Company ("Ray Morgan" or the "Company"), merged with UBEO Holdings, LLC (collectively with the other plaintiffs, "UBEO" or "Plaintiffs"). The merger agreement bound the sellers—Ray Morgan's stockholder signatories—to a five-year non-compete and non-solicitation provision. It also contained a forum selection provision designating Delaware courts as the exclusive forum.

Defendant Michael Drakulic sold copiers and printers as a mid-level manager at Ray Morgan. He lived and worked in California for the vast majority of his adult life. He owned a fraction of a share of Class B Ray Morgan stock and was thus a party to the merger agreement. That partial share entitled him to merger consideration valued at approximately nine months of his compensation. The other selling stockholders received far greater merger consideration, between

$2 million and $22 million. All of the selling stockholders except for Drakulic and one other retired after the merger.

Years after the merger, Drakulic decided to leave the Company to work for a competitor. UBEO then filed this action to enforce the five-year non-compete and non-solicitation provision contained in the merger agreement. Drakulic has moved to dismiss the action for lack of personal jurisdiction. As its sole basis for personal jurisdiction over Drakulic, UBEO argues that Drakulic consented to the jurisdiction of this court under the forum selection provision of the merger agreement. As its sole basis for enforcing the forum selection provision, UBEO points to a signature page to the merger agreement that Drakulic was emailed and that he executed. UBEO acknowledges that Drakulic never saw or read the agreement itself and was never made aware of the forum selection provision.

It is often the case that parties execute agreements that they do not read. The vast majority of the time, this court will still enforce the agreement. Yet, this case involves some highly unusual facts. Jurisdictional discovery revealed that: the agreement was negotiated by people to whom Drakulic reported and who harbored undisclosed conflicts of interest; Drakulic was never provided a copy of the merger agreement and was not informed of the agreement's forum selection provision or other provisions restricting his livelihood; and Drakulic was *intentionally* kept in the dark of the contents of the agreement.

In the face of these unusual facts, I am reticent to exercise personal jurisdiction over Drakulic on a consent-based theory. Drakulic's motion is granted and the case is dismissed without prejudice to Plaintiffs' ability to reassert their claims in an appropriate forum. My reasoning follows.

## I.     FACTUAL BACKGROUND

The facts are drawn from the pleadings, affidavits, and discovery of record.[1]

### A.     Drakulic Sold Copiers for Ray Morgan.

Ray Morgan is a document technology solutions company that provides copier, printer, and business office equipment sales and services nationwide.[2]  It is headquartered in Chico, California.[3]

Drakulic has spent his entire career working in the copier and printer industry.[4]  He joined Ray Morgan as a sales representative in November 2002.[5]  After seven years, Drakulic became a sales manager.[6]  Except for a brief stint in Oregon, Drakulic has worked and lived in California for his entire career.[7]  As a sales manager, Drakulic reported to Ray Morgan Executive Vice President Chris Scarff.[8]  In the organizational structure, Chris Scarff reported to President Greg Martin, who reported to CEO Jim Scarff.[9]  Drakulic acquired one share of Class B Ray

---

[1] *See, e.g.*, *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) ("In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record.").

[2] Am. Compl. ¶ 2.

[3] *Id.* ¶ 47.

[4] Def.'s Opening Br. in Support of His Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Opening Br.") Ex. 1 at Response 1.

[5] Dkt. 74, Pls.' Answering Br. in Opp'n to Michael Drakulic's Mot. to Dismiss Under Ch. Ct. R. 12(B)(2) ("Pls.' Answering Br.") Ex. A ("Drakulic Dep. Tr.") at 42:3–10.

[6] *Id.* at 42:3–10.

[7] Drakulic has lived in California since 1972, except in 1999–2000, at which time he lived in Oregon.  Def.'s Opening Br." Ex. 1 at Response 1.

[8] Defs.' Opening Br. Ex. 2.

[9] *Id.*

Morgan stock on June 1, 2010.[10]  It was later reduced to .37 of one share of Class B Ray Morgan stock.[11]

### B.    UBEO and Ray Morgan Negotiate a Merger.

Around June 2018, Ray Morgan began merger discussions with UBEO.[12]  To negotiate on its behalf, Ray Morgan formed a deal team comprising Jim Scarff, Martin, Chris Scarff, Executive CFO Bob Quadros, COO Sam Pulino, and Vice President of Service Mike Wysong (the "Deal Team").[13]

Drakulic was the only Ray Morgan stockholder who was not a member of the Deal Team.[14]

The issue of imposing non-compete obligations on Ray Morgan stockholders arose early in negotiations.[15]  Martin and a UBEO representative met around June 7, 2018, to discuss a number of deal terms, including non-competes.[16]  Martin's notes from the meeting state the following: "[UBEO] downplayed [the non-compete provision] and I agree.  Why would any of us want to start back up again independently when we would have a great challenge growing our business

---

[10] Defs.' Opening Br. Ex. 3.

[11] *See* Drakulic Dep. Tr. at 209:10–12.

[12] *See* Def.'s Opening Br. Ex. 6; Pls.' Answering Br. Ex. G ("Pulino Dep. Tr.") at 25:12–16. Plaintiffs UBEO Holdings, UBEO Intermediate, LLC, UBEO Midco, LLC, and UBEO, LLC are portfolio companies of private equity fund Sentinel Capital Partners.  Pls.' Answering Br. Ex. S ("Martin Dep. Tr.") at 80:2–7.  On July 1, 2018, the parties signed a letter of intent, and "[merger] negotiations started after that point."  Pulino Dep. Tr. at 25:12–16.

[13] *See id.* at 16:6–17; Def.'s Opening Br. Ex. 2.  Pulino acted as the selling stockholders' representative, a role in which he assured the deal team that he would "always have the best interests of [his] partners and [their] employees" in mind "in all [he] endeavor[ed] to accomplish. Def.'s Opening Br. Ex. 21.

[14] *See* Def.'s Opening Br. Ex. 1 at Response 1.

[15] *See* Def.'s Opening Br. Ex. 5.

[16] *See id.*

with an awesome return opportunity."[17] The "return opportunity" Martin referred to was "[t]he opportunity to earn additional dollars on the reinvestment side" by rolling over a portion of the merger consideration into UBEO equity.[18]

Drakulic was dissimilarly situated from the Deal Team members, for whom the benefit of an opportunity for return significantly outweighed burden of a non-compete obligation. Each of the Deal Team members owned between 10 times and 100 times the amount of equity owned by Drakulic.[19] Each of them stood to gain millions in merger consideration.[20] All but one of the Deal Team members have retired since the merger closed.[21] By contrast, Drakulic stood to gain an amount equivalent to nine months' salary.[22] A non-compete was material to him.[23]

Martin emailed his notes of the June 7 meeting to the Deal Team.[24] Drakulic was not a recipient of the email, never saw Martin's notes, and was never informed of the discussion at the June 7 meeting.[25]

---

[17] Def.'s Opening Br. Ex. 6 at UBEO00001808.

[18] Def.'s Opening Br. Ex. 7 ("Martin Dep.Tr.") at 45:6–22.

[19] *See* Def.'s Opening Br. Ex. 8 at UBEO00008572.

[20] *Id.*

[21] *See* Pulino Dep. Tr. at 78:16–80:11.

[22] *See* Def.'s Opening Br. Ex. 8 at UBEO00008572; Def.'s Opening Br. Ex. 35. This number was derived using Drakulic's total merger consideration and his 2017 all-in compensation. *See* Def.'s Opening Br. Ex. 8 at UBEO00008572; Def.'s Opening Br. Ex. 35.

[23] *See* Drakulic Dep. Tr. at 75:9–12 ("I would have never signed anything if I knew there was a non-compete in there or a non-solicitation. It would not have made sense for me financially and for other reasons.").

[24] Def.'s Opening Br. Ex. 6.

[25] *See id.*

Pulino led negotiations for Ray Morgan over the ensuing months.[26] He claims to have negotiated on behalf of all Ray Morgan stockholders, but he only spoke "a few times" with Drakulic during the over four months of negotiations.[27]

On September 6, 2018, UBEO emailed Martin a draft merger agreement containing a five-year non-compete, Delaware forum selection clause, and Delaware choice of law provision.[28] Martin forwarded the draft to the Deal Team but not to Drakulic.[29] Drakulic was not a recipient of that email and never saw the draft merger agreement.[30]

On September 12, 2018, Ray Morgan's corporate counsel, David Griffith, emailed comments on the draft merger agreement to Jim Scharff and Quadros.[31] The email called out "the five-year non-compete built into" the draft and the forum selection provisions, among other things.[32] The email also observed that employee non-competes (as opposed to the stockholder non-competes) are "not enforceable and against public policy in the State of California."[33]

---

[26] Def.'s Opening Br. Ex. 4 ("Chris Scharff Dep. Tr.") at 44:14–21; Pulino Dep. Tr. at 116:14–16.

[27] Drakulic Dep. Tr. at 52:4–53:7.

[28] Def.'s Opening Br. Ex. 10 at UBEO00017632.

[29] *Id.*

[30] *See* Def.'s Opening Br. Ex. 10 at UBEO00017632; Drakulic Dep. Tr. at 54:22–57:5.

[31] Def.'s Opening Br. Ex. 10 at UBEO00017628–31.

[32] *Id.* at UBEO00017630.

[33] *Id.*

Although Griffith claimed to represent Ray Morgan's stockholders in addition to the Company at that time, he never spoke to Drakulic.[34] Drakulic was not a recipient of Griffith's September 12 email and was never informed of its contents.[35]

Ray Morgan ultimately retained separate counsel, Cara Stone LLP ("Cara Stone"), to represent its stockholders in merger negotiations, and Drakulic was sent a copy of the engagement letter on September 24, 2018.[36] The letter provided that it "is a binding contract for legal services . . . on behalf of [Ray Morgan], . . . Drakulic . . . [and the other stockholders of Ray Morgan]."[37] The letter defined the scope of work to include "[r]eviewing a proposed purchase agreement . . . and provid[ing] requested legal analysis, . . . recommendations, and, as appropriate, assistance with documentation relating to the same."[38]

Ray Morgan later hired a firm to provide tax advice to its stockholders. On October 22, 2018, Quadros forwarded to Drakulic an engagement letter from Bret Kanis of Hightower Law Firm ("Hightower").[39] The engagement letter stated that the firm was available to offer "tax advice in connection with the proposed sale of [Ray Morgan] . . . pursuant to that draft Merger, Contribution and Asset Purchase Agreement dated October 8, 2018 . . . [and,] upon request,

---

[34] Drakulic Dep. Tr. at 130:7–8 ("I had no idea that David Griffith was involved in the merger. . . .").

[35] *See* Def.'s Opening Br. Ex. 10 at UBEO00017628; Drakulic Dep. Tr. at 130:7–8.

[36] Pls.' Answering Br. Ex. I.

[37] *Id.* at UBEO00003134.

[38] *Id.* at UBEO00003135.

[39] Pls.' Answering Br. Ex. H.

additional future services in connection with such sale."[40]  Drakulic's signature appears on both

engagement letters.[41]

Drakulic believed that his interests were represented in the negotiations.[42]

In addition to speaking a few times with Pulino, Drakulic received updates from time-to-time (he estimates once a month) throughout the merger negotiations from Martin and Chris Scarff.[43]  At some point in these conversations, Drakulic learned that UBEO and the Deal Team agreed to allow Ray Morgan stockholders to invest up to 10% of their yearly income in the post-merger entity, which equated to a $27,000 maximum investment for Drakulic.[44]  Drakulic asked to increase the size of his investment around October 1, 2018.[45]  The Deal Team members agreed to this, and Drakulic ultimately invested $80,000 in UBEO.[46]

The internal email exchange among the Deal Team on this issue was troubling for other reasons.  Chris Scarff relayed Drakulic's request to increase the maximum size of this investment to the other members of the Deal Team in the following email:

> Going forward, it is extremely important that information is *kept*
> *very close to the vest*.  By [Drakulic] sharing with me that he was

---

[40] *Id.* at UBEO00000008.

[41] *See* Pls.' Answering Br. Ex. I at UBEO00003137; Pls.' Answering Br. Ex. Y at UBEO00016459. Drakulic disputes that he signed the Cara Stone engagement letter.  *See* Drakulic Dep. Tr. at 134:24–135:17.

[42] *See id.* at 153:14–18 ("[A]s far as I knew, . . . [Pulino] was acting on our behalf and with our best interests in mind."); *id.* at 177:15–17 (testifying that he "trust[ed] that [Pulino] had [his] best interests in mind").

[43] *See id.* at 49:5–50:18, 51:12–52:3; Pulino Dep. Tr. at 79:2–3.

[44] *See* Drakulic Dep. Tr. at 199:10–13; Def.'s Opening Br. Ex. 14 at UBEO00001563.  From 2015 through 2017, Drakulic earned, on average, approximately $270,000 per year.  Def.'s Opening Br. Ex. 35.

[45] *See* Drakulic Dep. Tr. at 201:6–9; Pls.' Answering Br. Ex. J.

[46] *See* Drakulic Dep. Tr. at 201:2–12; Def.'s Opening Br. Ex. 8 at UBEO00008572.

> told that $11M is the reinvestment limit, puts us in a real uncomfortable position. We all want to do positive/generous things *for our employees*, and the more information that is shared can possibly turn something generous into varying perception.[47]

Chris Scharff was concerned that Drakulic learned of the $11 million investment limit from a Deal Team member involved in the process and was worried about this leak. He reminded Deal Team members to keep information "close to the vest" so that employees did not feel slighted. In this email, it seems clear that Chris Scharff viewed Drakulic as standing on the employee side of the divide.

Cara Stone prepared a six-page memorandum summarizing the "key issues presented in the draft" merger agreement.[48] It was dated October 9, 2018, and was emailed to the Deal Team on October 10, 2018.[49] The memorandum called out the non-compete, stating:

> Sections 7.3(b) and (c) prohibit [the selling stockholders] from competing with the [post-merger company] anywhere in the United States and soliciting employees or poaching customers or suppliers for a period of 5 years from the Closing Date. Although provisions of sort are not uncommon, *we note that the [letter of intent] is silent on the issue, and that the restricted period and area are arguably excessive in the absence of employment agreements* (providing for payments for termination without cause). *We should discuss the non-compete and non-solicitation provisions in this context.*[50]

Drakulic did not receive this email, nor did anyone communicate its contents to him.[51]

---

[47] Def.'s Opening Br. Ex. 14 at UBEO00001563 (emphasis added).

[48] Def.'s Opening Br. Ex. 17 at UBEO00007721.

[49] *Id.*

[50] *Id.* at UBEO00007731 (emphasis added).

[51] *See* Drakulic Dep. Tr. at 136:10–22 ("Q. You knew that Cara Stone was performing services for all the shareholders, didn't you? A. Not prior to the close of the merger, no. Not prior to the lawsuit, let me put it that way. . . . Q. And you've sworn under oath you never communicated with any attorney before the closing of the merger, correct? A. Yes, except for that Hightower document that I signed, but I did not -- as far as I know, I did not speak with any attorney from any firm."); *id.* at 249:18–22 ("Q. So would it be correct to say that you never received any

Ray Morgan also engaged an accountant, Paul Catanese, to review the draft merger agreement.[52] On October 10, 2018, Catanese emailed Martin outlining several financial and tax-related issues with the agreement.[53] Catanese stated that resolving the issues "would be more successful and achievable" if there was "[f]ull disclosure of the non competes and what they mean for each owner."[54] Drakulic was not a recipient of this email and was not made aware of its contents.[55]

The Deal Team asked Drakulic to execute the final merger agreement (the "Merger Agreement") on November 4, 2018, but they only emailed him the signature page.[56] Drakulic signed the signature page.[57]

The Deal Team asked Drakulic to execute other documents "for closing" the next day.[58] These documents were a Non-Foreign Status Affidavit of Individual Seller, a Form W-9, the Joinder to Securityholders Agreement, and the Second A&R LLC Agreement of UBEO

---

communication from any lawyer at the Cara Stone firm prior to the date you signed the blank signature page for the Merger Agreement? A. Yes."); *id.* at 263:9–12 ("Q. Did you ever get any advice about any provisions of the Merger Agreement from the Cara Stone firm? A. No."); Pulino Dep. Tr. at 122:10–13 ("Q. Did you show [the Cara Stone] memorandum to Michael Drakulic with the specific reference to point -- did you ever show this memorandum to Michael Drakulic? A. No, I don't -- do not believe. I did not.").

[52] Martin Dep. Tr. at 46:10–47:1; *see also id.* at 46:16–17 (noting that Catanese was not employed by Ray Morgan but the Company had previously "outsourced things to him").

[53] *See* Def.'s Opening Br. Ex. 18.

[54] *Id.* at UBEO00003352.

[55] *See id.*; Martin Dep. Tr. at 47:17–48:6.

[56] Pls.' Answering Br. Ex. L at UBEO00000118–19; *see also* Pls.' Answering Br. Ex. Q ("Merger Agreement").

[57] Drakulic Dep. Tr. at 147:24–148:1.

[58] Pls.' Answering Br. Ex. M at UBEO00000063.

Holdings, LLC.[59]  The Joinder to Securityholders Agreement included a Delaware choice-of-law provision.[60]  Scharfenberg added:  "Please let me know if you have any questions."[61]

That night, the Deal Team sent a memorandum to "All [Ray Morgan] Colleagues," titled "Ray Morgan Company merges with UBEO Holdings."[62]  The memorandum included details regarding the merger and answered a number of questions.[63]  It informed employees that "[a]ll the owners, executives and managers will remain in their current roles and maintain a strong equity position in [Ray Morgan]."[64]  Further, it assured employees that there would not be "any negative impact to [them] due to this strategic financial investment."[65]

Although Drakulic was not provided a copy of the merger agreement at any point during the negotiations, Drakulic received the above email assuring him that the merger would have no negative impact.[66]

Around November 7, 2018, Drakulic, in his capacity as a stockholder, executed the Joint Written Consent of the Board of Directors and Stockholders of Ray A. Morgan Company A

---

[59] *Id.* at UBEO00000064–74.

[60] *Id.* at UBEO00000071–72.

[61] *Id.* at UBEO00000063.

[62] *See* Def.'s Opening Br. Ex. 34.

[63] *Id.* at UBEO00001679–80.

[64] *Id.* at UBEO00001679.

[65] *Id.* at UBEO00001680 ("We will continue to make [Ray Morgan] a better place for all our colleagues and their families.").

[66] *See id.*; Drakulic Dep. Tr. at 56:15–57:9.

California Corporation.[67]  The consent did not reference the non-compete, non-solicitation, or forum selection provisions nor attach the relevant agreements.[68]

The merger closed on November 7, 2018.[69]  Drakulic's payout from the merger was $215,712.39, of which $135,712.39 was a cash distribution and $80,000 was rolled over into UBEO Holdings' equity.[70]  As noted above, the consideration paid to the other stockholders—all Deal Team members—ranged from $2 million to $22 million.[71]

### C.  Terms of the Merger Agreement

A few provisions of the Merger Agreement are relevant to this dispute.

Section 7.3 restricts Drakulic from competing with Ray Morgan anywhere in the United States or soliciting any Ray Morgan employees or customers for a five-year period (the "Non-Compete Provision").[72]

---

[67] Pls.' Answering Br. Ex. P.

[68] *See id.*

[69] Merger Agreement.  "Ray A. Morgan Company" and "RMC A Ray Morgan Company, LLC" were separate entities.  *See id.* at Preamble.  The Merger Agreement defined "Sellers" as the Ray A. Morgan Company "[s]tockholders" and the RMC A Ray Morgan Company, LLC "[e]quityholders."  *Id.*  The parties do not explain the relationship between these two entities, nor do they discuss whether the distinction is material to the issue before the court.  In addition, both parties simply refer to Ray Morgan's "stockholders" throughout their briefs.  For those reasons, this decision refers to the Sellers as "stockholders" to avoid unnecessary confusion.

[70] Def.'s Opening Br. Ex. 8 at UBEO00008572.

[71] *See id.* (funds flow chart showing merger distributions); Def.'s Opening Br. Ex. 11 (noting that Jim Scarff, Greg Martin, Chris Scarff, and Sam Pulino each own a 25% membership interest in RMC a Ray Morgan Company, LLC).

[72] Merger Agreement § 7.3.

Section 7.6 guaranteed employment for Ray Morgan employees with the post-merger entity upon the consummation of the merger (although it did not guarantee continued employment).[73]

Section 9.14 gives "any state or federal court sitting in Wilmington, Delaware" the "exclusive jurisdiction" to resolve "any action or proceeding arising out of or relating to this Agreement" (the "Forum Selection Provision").[74]

Although the parties present conflicting testimony as to whether Drakulic was ever made aware of the Non-Compete Provision,[75] Drakulic denies being made aware of the Forum Selection Provision,[76] and Plaintiffs do not contend otherwise.

---

[73] *See id.* § 7.6(a) ("UBEO shall, or shall cause one of its Affiliates to, offer employment to each [Ray Morgan] employee . . . who is employed on the Closing Date contingent upon and effective as of the Closing Date. Such offers of employment shall initially be for the same base wages and salary (not including equity or equity-based compensation, deferred compensation, severance, retention bonuses, or change-in-control bonuses) as provided by [Ray Morgan] immediately prior to the Closing Date."); *id.* § 7.6(e) ("This Section 7.6 shall not be construed . . . to create any right in any Person . . . to employment or continued employment or any particular term or condition of employment with UBEO or any of its Affiliates or limit the ability of UBEO or any of its Affiliates . . . to terminate the employment of any employee . . . at any time and for any or no reason . . . .").

[74] *Id.* § 9.14.

[75] Drakulic testified that he was never made aware of it; Pulino testified that he apprised Drakulic of the provision. *Compare* Drakulic Dep. Tr. at 53:2–7 ("Q. Mr. Pulino also kept you apprised of the terms of the agreement, correct? A. No. Q. Mr. Pulino actually discussed with you certain terms of the agreement; isn't that correct? A. That's not correct."), *with* Pulino Dep. Tr. at 19:7–12 ("Q. Can you tell me specifically what was said by you to Mr. Drakulic at any one of those meetings? A. Specifically deal points were spoken about surrounding our -- you know, basically when the close would happen. We talked about that. We talked about the non-compete."). Chris Scarff testified that he "believe[d] that [Drakulic] should have been shown a copy of the agreement before being asked to sign it." Def.'s Opening Br. Ex. 4 ("Chris Scarff Dep. Tr.") at 72:16–19. He further testified: "I would believe [Drakulic] was either shown [a copy] or he would have asked for one and been shown it." *Id*. at 72:21–73:1.

[76] *See* Drakulic Dep. Tr. at 53:2–7, 54:8–57:9, 186:16–190:17.

### D.     Drakulic's Departure from Ray Morgan

Drakulic worked for Ray Morgan until July 2020.[77]   Around July 9, 2020, Drakulic informed Martin that he and another Ray Morgan employee would be leaving the Company to join a start-up that intended to compete with UBEO, Global Office Inc. ("Global Office").[78]   The Amended Complaint alleges that, before leaving Ray Morgan, Drakulic met by phone and through web-based video platforms with founders of Global Office.[79]

Drakulic claims to have become aware of the Non-Compete during a July 18, 2020 meeting with Martin to discuss Drakulic's desire to leave the Company.[80]   After the meeting, on July 21, 2020, Drakulic requested a copy of the Merger Agreement from Martin and Travis Sheffield of UBEO.[81]

Richard Whitlock of Ray Morgan responded to Drakulic's request by providing an *excerpted* version of the Merger Agreement with only the table of contents, Sections 7.1 through 7.6 containing the Non-Compete Provision and restrictive covenants, and the signature pages.[82]

Drakulic did not become aware or receive a copy of the Forum Selection Provision until UBEO attached it as an exhibit to its pleadings in this action.[83]

---

[77] *See id.* at 42:3–16.  In 2019, Drakulic's last full year of employment with Ray Morgan, his total compensation was $208,021.  Def.'s Opening Br. Ex. 35.  In the first half of 2020, his total compensation was $115,139.  *Id.*

[78] *See* Martin Dep. Tr. at 71:7–72:10, 91:18–93:4; Am. Compl. ¶ 3.

[79] Am. Compl. ¶¶ 8, 37, 39–42.

[80] *See* Pls.' Answering Br. Ex. U.

[81] Def.'s Opening Br. Ex. 38.

[82] *See* Def.'s Opening Br. Ex. 41.

[83] *See* Drakulic Dep. Tr. at 188:14–189:1, 256:23–257:2.

Drakulic left Ray Morgan in mid-2020.[84]

### E.     This Litigation

On August 13, 2020, UBEO filed this action against Drakulic along with a motion to expedite and a motion for a temporary restraining order enjoining Drakulic from competing with UBEO.[85] On August 19, 2020, the court granted Plaintiffs' motion to expedite and held the motion for a temporary restraining order in abeyance, instructing the parties to meet and confer "to at least allay immediate concerns mooting the need for another TRO hearing."[86]

Defendant filed a motion to dismiss, and Plaintiffs amended their complaint in response (the "Amended Complaint").[87] The Amended Complaint asserts three counts:  Count I alleges that Defendant breached Section 7.3(b) of the Merger Agreement as a result of his employment with Global Office;[88] Count II alleges that Defendant breached Section 7.3(b) of the Merger Agreement as a result of his equity ownership in Global Office;[89] and Count III alleges that Defendant breached Section 7.3(c) of the Merger Agreement by soliciting a Ray Morgan employee

---

[84] Am. Compl. ¶ 4.

[85] *See* Dkt. 1, Pls. UBEO Holdings, LLC, UBEO Intermediate, LLC, UBEO Midco, LLC and UBEO, LLC's Verified Compl. for Breach of Contract; Dkt. 2, Pls. UBEO Holdings, LLC, UBEO Intermediate, LLC, UBEO Midco, LLC and UBEO LLC's Mot. for Expedited Proceedings; Dkt. 3, Pls. UBEO Holdings, LLC, UBEO Intermediate, LLC, UBEO Midco, LLC and UBEO LLC's Mot. for Temporary Restraining Order.

[86] Dkt. 25, Aug. 19, 2020 Telephonic Oral Arg. and Partial Rulings of the Ct. on Pls.' Mots. ror Expedited Proceedings and Temporary Restraining Order, at 30.

[87] *See* Dkt. 17, Michael Drakulic's Mot. to Dismiss; Am. Compl.

[88] Am. Compl. ¶¶ 52–59.

[89] *Id.* ¶¶ 60–66.

to leave the employment of Ray Morgan and join Global Office.[90]  Plaintiffs again moved for a temporary restraining order, which the court denied.[91]

Defendant renewed his motion to dismiss on September 17, 2020, and the parties completed briefing on January 18, 2021.[92]  The court heard oral argument on January 21, 2021.[93]

## II.    LEGAL ANALYSIS

Defendant has moved to dismiss all Counts of the Amended Complaint under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.  "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[94]

Generally, Delaware courts resolve questions of jurisdiction using a two-step analysis, first determining "that service of process is authorized by statute,"[95] and next determining that the defendant had certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[96]

---

[90] *See id.* ¶¶ 67–73.

[91] *See* Dkt. 21, Pls. UBEO Holdings, LLC, UBEO Intermediate, LLC, UBEO Midco, LLC and UBEO, LLC's Am. Mot. for Temporary Restraining Order; Dkt. 35, Sept. 9, 2020 Oral Arg. Re Pls.' Am. Mot. for a Temporary Restraining Order and the Ct.'s Ruling.

[92] *See* Dkt. 32, Michael Drakulic's Mot. to Dismiss Under Ct. Ch. R. 12(b)(2); Def.'s Opening Br.; Pls.' Answering Br.; Dkt. 75, Michael Drakulic's Reply. Br. in Supp. of His Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Reply Br.").

[93] Dkt. 80, Jan. 21, 2021 Tr. of the Oral Arg. On Def.'s Mot. to Dismiss Pls.' Am. Compl. Held Via Zoom.

[94] *Ryan*, 935 A.2d at 265 (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[95] *Id.*

[96] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

Plaintiffs rely exclusively on the Forum Selection Provision to establish jurisdiction over Drakulic.[97] When a party is bound by a forum selection clause, "the party is considered to have expressly consented to personal jurisdiction."[98] "An express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process."[99]

Forum selection clauses are *prima facie* valid under Delaware law.[100] A forum selection clause will generally be enforced where the elements for enforcing a contract are met.[101] Conversely, a forum selection clause is not enforceable where such "enforcement would be unreasonable and unjust," or where "the clause [is] invalid for such reasons as fraud and overreaching."[102]

For a contract to be enforceable, the parties must have "intended that the contract would bind them."[103] Whether phrased as "intent to be bound" or "meeting of the minds," this court's

---

[97] *See* Am. Compl. ¶¶ 17–19.

[98] *AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *10 (Del. Ch. Nov. 26, 2019) (quoting *Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp.2d 452, 456 (D. Del. 2008)).

[99] *Solae*, 557 F. Supp. 2d at 456 (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1116 (Del. 1988)); *see also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum.") .

[100] *E.g.*, *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 148 (Del. 2016) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).

[101] *See, e.g.*, *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013); *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146–47 (Del. 2010).

[102] *See Ingres*, 8 A.3d at 1146 (alteration in original); *see also id.* ("Courts should assess the reasonableness of a forum selection clause on a case-by-case basis.").

[103] *Eagle Force*, 187 A.3d at 1229 (quoting *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

determination is "based upon [the parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[104]

"[I]n applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions—including the putative contract itself."[105] Although the contract itself is not dispositive to this analysis, "a wet ink, signed version of a contract looks to be solid evidence of a meeting of minds."[106] This court may, nonetheless, "consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement."[107]

In this case, there was clearly no meeting of the minds as to the Forum Selection Provision, which Drakulic never reviewed. He did not even know of its existence until this litigation because he was not informed by the persons supposedly negotiating on his behalf. The Deal Team kept information "close to the vest" and intentionally withheld such critical details from Drakulic.

In support of enforcing the provision, Plaintiff focuses on one fact: that Drakulic executed the signature page of the Merger Agreement. Plaintiff adds, and it is true, that Drakulic could have asked more questions when negotiations were ongoing. He could have requested a copy of the

---

[104] *See Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *16 (Del. Ch. Aug. 21, 2019) (quoting *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).

[105] *Eagle Force*, 187 A.3d at 1229–30 ("Under Delaware law, overt manifestation of assent—not subjective intent—controls the formation of a contract." (internal quotation marks omitted)); *see also Lynch v. Gonzalez*, 2020 WL 4381604, at *31 (Del. Ch. July 31, 2020) ("Where the objective, contemporaneous evidence indicates that the parties have reached an agreement, they are bound by it, regardless of its form or the manner in which it was manifested.").

[106] *See Kotler*, 2019 WL 4025634, at *17.

[107] *Eagle Force*, 187 A.3d at 1230.

Merger Agreement. He could have expressed greater concern. But he voluntarily executed the signature page without any such investigation.[108]

Most of the time, Delaware law will hold a party to the terms of the agreement she executed even if she never read the agreement.[109] There are many reasons for this approach, but the overarching concern is that if a party to a contract could use her failure to read a contract as a way to circumvent her obligations, "contracts would not be worth the paper on which they are written."[110]

In this unusual case, a variety of factors yield a different conclusion. Foremost, although "a . . . signed version of a contract" is typically "solid evidence of a meeting of minds[,] . . . it is

---

[108] Drakulic Dep. Tr. at 147:24–148:1.

[109] *See, e.g.*, *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 677 (Del. 2013) ("[A] party cannot seek avoidance of a contract he never read."); *W. Willow–Bay Ct., LLC v. Robino–Bay Ct. Plaza, LLC,* 2009 WL 3247992, at *4 n.19 (Del. Ch. Oct. 6, 2009) ("'[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.'" (quoting 27 *Williston on Contracts* § 70.113 (4th ed. 2009))), *aff'd,* 985 A.2d 391 (Del. 2009) (TABLE); *Patel v. Dimple, Inc.*, 2007 WL 2353155, at *11 n.22 (Del. Ch. Aug. 16, 2007) ("A party's failure to read a contract does not justify its avoidance."); *Moore v. O'Connor*, 2006 WL 2442027, at *4 (Del. Super. Aug. 23, 2006) ("Even if [defendant] was, in fact, unaware of the effect his initials on the June 30, 2006 agreement would have regarding the good will payment, he is still responsible for the contents of the writing to which he assented. One of the basic tenets of contract law is that a party is responsible for the terms of a contract they sign, even if unaware of the terms."); *Harrington Raceway, Inc. v. Vautrin*, 2001 WL 1456873, at *3 ("[T]he Court cannot protect business people who decide to sign contracts . . . without reading them.") (Del. Super. Aug. 31, 2001); *TP Gp.–CI, Inc. v. Vetecnik*, 2016 WL 5864030, at *1 (D. Del. Oct. 6, 2016) ("Defendant's only argument with respect to the non-compete is that he was not aware of the existence of the agreement. The law is well settled, however, that failure to read a contract does not excuse performance." (citing *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989))).

[110] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)); *see also Graham*, 565 A.2d at 913 (observing that it would be unjust to allow a party to a contract to "silently accept its benefits and then object to its perceived disadvantages").

not evidence so powerful that it negates all other evidence to the contrary."[111]  Plaintiffs do not deny that Drakulic was wholly unaware of the Forum Selection Provision when he executed the signature page.  There was simply no meeting of the minds as to this critical term.  There was no actual consent.

More worrisome, as applied to Drakulic, the Forum Selection Provision is akin to a contract of adhesion, or a "standard-form contract prepared by one party, to be signed by another party in a weaker position, usu[ally] a consumer, who adheres to the contract with little choice about the terms."[112]

"A contract of adhesion may be declared unenforceable, in whole or in part, if its terms are unconscionable within the meaning of 6 *Del. C.* § 2-302."[113]  Under 6 *Del. C.* § 2-302:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.[114]

Section 2-302 permits a court to strike unconscionable clauses.  This court may also sever a forum selection provision from the agreement in which it is contained and separately assess its enforceability.[115]

---

[111] *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019).

[112] *Adhesion Contract*, Black's Law Dictionary (11th ed. 2019).

[113] *Graham*, 565 A.2d at 912.

[114] 6 *Del. C.* § 2-302(1).

[115] *See Nat'l Indus.*, 67 A.3d at 380 (agreeing that "a party cannot escape a valid forum selection clause . . . by arguing that the *underlying contract* was invalid for a reason unrelated to the forum selection . . . clause itself"); *see also Rucker v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1238 (11th Cir. 2011) ("A forum selection clause is viewed as a separate contract that is severable from the agreement in which it is contained." (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519

The parties cited no Delaware case directly addressing whether facts as unusual as those present here render a contractual clause unconscionable. Plaintiffs argue that the Delaware Supreme Court's decision in *Graham v. State Farm Mutual Automotive Company* supports their holding.[116] There, a dispute arose from an arbitration provision in the plaintiffs' automotive insurance agreement.[117] The parties agreed that the plaintiffs were not explicitly advised of the inclusion of this language in the agreement and did not receive a copy of the policy until after they had paid their first premium.[118] Two years after receiving a copy of the agreement, however, the plaintiffs "silent[ly] accept[ed] . . . the policy's coverage."[119]

To avoid the arbitration provision, the plaintiffs argued that "they should not be bound by contract terms to which they did not explicitly assent."[120] Assessing the facts within the framework of 6 *Del. C.* § 2-302, the court held that the arbitration provision did not "unfairly favor[]" the insurer and was not "unfairly structured."[121] Further, the court was unpersuaded by the plaintiffs' argument that their policy was presented on a "take-it-or-leave-it basis."[122] The court held that "if

---

n.14 (1974))); *Marra v. Papandreou*, 216 F.3d 1119, 1123 (D.C. Cir. 2000) ("A forum-selection clause is understood not merely as a contractual provision, but as a distinct contract . . . that is separate from the obligations the parties owe to each other under the remainder of the contract.").

[116] *See* Pls.' Answering Br. at 28–34 (citing *Graham*, 565 A.2d 908); Def.'s Reply Br. at 7–11 (same).

[117] 565 A.2d at 910.

[118] *Id.*

[119] *Id.*

[120] *Id.* at 912.

[121] *Id.* at 912–13. The *Graham* court further held that "it would be highly inappropriate if this Court were to find a contract unconscionable because it adheres to the declared public policy of this State." *Id.* at 913. But that was not the sole factor—or even the driving factor—supporting the court's conclusion. *See id.* at 911–13. It is therefore immaterial that the court here is not presented with the same public policy concern (arbitration).

[122] *Id.* at 913 (internal quotation marks omitted).

the [plaintiff] had read their policy after receiving it, they would have discovered the arbitration clause," and "[i]f they then believed this clause to be sufficiently objectionable, they could have cancelled the policy and sought coverage with another insurer on more agreeable terms."[123] As support for this holding, the court noted that "[a] party to a contract cannot silently accept its benefits and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance."[124] Accordingly, the court concluded that the agreement was enforceable.[125]

Unlike the plaintiff in *Graham*, Drakulic was never presented with the Forum Selection Provision prior to this litigation. He did not read it before signing the signature page of the Merger Agreement. Plaintiffs fault Drakulic for failing to seek out and obtain a copy of the Merger Agreement before signing it, but the contemporaneous evidence suggests that the Deal Team intended to keep Drakulic uninformed. In fact, when Drakulic subsequently requested a copy of the Merger Agreement after leaving Ray Morgan, the Company sent him an excerpted version that did not include the Forum Selection Provision.[126]

The leading federal decision concerning the enforceability of forum selection clauses in contracts of adhesion is *Carnival Cruise Lines, Inc. v. Shute*.[127] There, the Supreme Court of the

---

[123] *Id*. The court noted that "the policy contains a clause allowing the insured to cancel coverage at any time." *Id.* at 913 n.5.

[124] *Id.* at 913.

[125] *Id*. The Supreme Court of Ohio applied *Graham* to a similar set of facts in *Henderson v. Law. Title Ins. Corp. See* 843 N.E.2d 152, 160 (Ohio 2006). There, however, the insureds did not receive a copy of their agreement until after closing and, at that point, they could not have voided it. *Id.* Based on that distinguishing fact, the court held that the arbitration clause was unenforceable. *Id.* Here, Drakulic did not receive a copy of the Forum Selection Provision until this litigation began, indicating that it too is unenforceable.

[126] None of the other cases to which Plaintiffs cite present the same degree of overreaching exhibited by the Deal Team.

[127] 499 U.S. 585 (1991).

United States rejected the lower court's conclusion that a non-negotiated forum selection clause in a cruise ticket is categorically unenforceable "simply because it [was] not the subject of bargaining."[128]  In *Carnival Cruise*, however, the "respondents have conceded that they were given notice of the forum provision,"[129] and subsequent decisions have distinguished *Carnival Cruise* on that basis.[130]

Plaintiffs cite to *Jerez v. JD Closeouts, LLC*, for example, where a New York state court declined to enforce a forum selection provision in an e-commerce transaction.[131]  The court distinguished *Carnival Cruise Lines* as involving "a fact-pattern where the passengers 'conceded that they were given notice of the forum provision, and, therefore, presumably retained the option of rejecting the contract with impunity.'"[132]  By contrast, in *Jerez*, the plaintiff "never saw the provision before, and defendants present no evidence that the 'terms of sale' listed on their website were ever communicated to plaintiff in connection with the transaction."[133]  The court reasoned that "[u]nder the law of contract, the absence of such a communication is critically important in determining whether the forum clause will be enforced," and declined to enforce the provision.[134]

---

[128] *Id.* at 593.

[129] *Id.* at 595.

[130] *See, e.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006)); *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995); *Testa v. Becker*, 2010 WL 1644883, at *5 (C.D. Cal. Apr. 22, 2010); *Mezyk v. U.S. Bank Pension Plan*, 2009 WL 3853878, at *3 (S.D. Ill. Nov. 18, 2009); *O'Brien v. Okemo Mountain, Inc.*, 17 F. Supp. 2d 98, 103 (D. Conn. 1998).

[131] 943 N.Y.S. 2d at 398–99.

[132] *Id.* at 396.

[133] *Id.*

[134] *Id.*

The reasoning of *Jerez* applies with more force here. Apart from the Forum Selection Provision not being communicated to Drakulic by Plaintiffs, it was negotiated by his direct supervisors. The Deal Team and their advisors let Drakulic down by concealing their own conflicts of interest and the existence of terms that were harmful to Drakulic. Drakulic was not an arm's-length negotiator who missed buried terms—he was represented by persons who failed him. For these reasons, it would be unconscionable to enforce the Forum Selection Provision against Drakulic.

This decision is quite limited. It does not address the enforceability of the other provisions of the Merger Agreement, which may not raise the same due process considerations as the Forum Selection Provision. It focused mainly on the authorities cited by the parties and not the wealth of additional authorities on this issue. It is certainly not an invitation to allow parties to "radically redefine" their contracts "simply by proving that [they] had not been informed of its stated terms in advance."[135] In the end, the court's driving concern is that it would simply be unjust to assert personal jurisdiction over Drakulic under a consent-based theory where consent was a total fiction.

For the foregoing reasons, Drakulic's motion to dismiss is granted.

IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Kathaleen St. Jude McCormick
Vice Chancellor

cc:    All counsel of record (by *File & ServeXpress*)

---

[135] *See Graham*, 565 A.2d at 912.