# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALCHEMY LTD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0476-LWW |
| | ) | |
| FANCHISE LEAGUE COMPANY, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 26, 2023
Date Decided: July 20, 2023

F. Troupe Mickler IV, ASHBY & GEDDES, P.A., Wilmington, Delaware; Edgar G. Sargent, SUSMAN GODFREY L.L.P., Seattle, Washington; *Counsel for Plaintiff Alchemy LTD LLC*

Sarah E. Delia, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Counsel for Defendant FANchise League Company, LLC*

**WILL, Vice Chancellor**

Everything has a price. Here, the plaintiff bargained for an option right in exchange for $1,000. The plaintiff never made the payment yet seeks to enforce the option right. Its post-hoc rationalizations are meritless. Summary judgment is granted in favor of the defendant.

## I.     FACTUAL BACKGROUND

This opinion recites only the facts necessary to resolve the parties' cross-motions for summary judgment on contract interpretation. The following background is, unless otherwise noted, drawn from the undisputed facts in the pleadings and documentary exhibits submitted by the parties.

### A.     The Fan Controlled Football League

Defendant FANchise League Company, LLC, a Delaware limited liability company headquartered in California, owns and operates the Fan Controlled Football League (the "FCFL").[1]   The FCFL is a professional football league combining traditional sports with elements of e-games, social media, and crowdsourcing.[2] The league, which commenced play in 2021, uses electronic voting

---

[1] Answer to Verified Compl. (Dkt. 8) ("Answer") ¶ 8.

[2] *Id.* ¶ 11.

to allow fans to decide matters from team names to proposed rule changes to individual plays called during games.[3]

When the league was in its infancy, FANchise sought a "partner" with digital token experience.[4] It found plaintiff Alchemy LTD LLC ("New Alchemy"), a Washington entity.[5] On March 14, 2018, FANchise retained New Alchemy to consult on the token FANchise planned to release for FCFL fan activity.[6] In exchange for these consulting services, FANchise would pay New Alchemy a fee.[7]

## B. The Simple Agreement for Future Tokens

FANchise and New Alchemy also discussed a potential investment by New Alchemy. On April 18, 2018, they entered into the Simple Agreement for Future Tokens (the "SAFT").[8] New Alchemy agreed to invest up to $1 million in exchange for the right to receive so-called "FAN Tokens"—cryptographic public utility tokens associated with the FCFL.[9] FANchise planned to launch a public sale of FAN

---

[3] *Id.* ¶¶ 11, 13; *see also* Patrick Hruby, *Are You Ready for Some (Fan-Controlled) Football?*, Wash. Post Mag. (Oct. 16, 2019), https://www.washingtonpost.com/news/magazine/wp/2019/10/16/feature/are-you-ready-for-some-fan-controlled-football/.

[4] Aff. of F. Troupe Mickler IV Supp. Pl.'s Opening Br. Supp. Mot. Summ. J. (Dkt. 35) ("Mickler Aff.") Ex. 2 at 20.

[5] Answer ¶¶ 7, 15.

[6] *Id.* ¶ 16; Mickler Aff. Ex. 3 ("MSA") at Recitals.

[7] MSA at 10-11.

[8] Answer ¶ 17; Mickler Aff. Ex. 1 ("SAFT").

[9] Answer ¶ 18; SAFT §§ 1(e), 2(a).

Tokens, at which time New Alchemy would receive an allotment of FAN Tokens at a discount to the public offering price.[10] But, if FANchise did not begin its public FAN Token sale by April 1, 2019 (the "Dissolution Event"), FANchise would refund New Alchemy's full investment.[11] Once FANchise issued FAN Tokens to New Alchemy, or the Dissolution Event occurred and New Alchemy's investment was repaid, the SAFT would "expire and terminate."[12]

New Alchemy's $1 million investment was two-tiered. Initially, New Alchemy would invest $333,333.[13] If FANchise raised $10 million from other investors, then New Alchemy would invest the remaining $666,667.[14]

In addition to the right to receive FAN Tokens for a $1 million investment, the SAFT contemplated a separate right to an "Option."[15] For a payment of "an additional $1,000," New Alchemy would receive an Option to acquire an FCFL team

---

[10] SAFT § 2(a)(i).

[11] *Id.* § 2(b).

[12] *Id.* § 2(c).

[13] *Id.* § 1(i).

[14] *Id.*

[15] *Id.* § 2(e).

and sponsorship rights.[16]  The Option was exercisable for no additional fee.  The

Option provision of the SAFT states:

> Option.  In exchange for an additional $1,000, Company [FANchise] hereby grants Purchaser [New Alchemy] an option that will terminate upon the 3-year anniversary of the inaugural game of the FCFL to acquire a franchise in the FCFL and in the following 2 sports leagues (each a "New Franchise") created by Company thereafter ("Option"). Purchaser will be subject to each league's operating agreement, bylaws, league affiliation agreement, and any other rules of team ownership established by the Company for each league.
>
> i.   The Option shall be exercisable, with no additional fee, after the initial season, or Jan. 2020, whichever is sooner, and notice by Purchaser to exercise the Option must be provided no later than 30 days before the end of the season;
>
> ii.   Prior to exercise of the Option, Purchaser will have the right to sponsor one team for the first two FCFL seasons.  The sponsorship shall include jersey patch and other sponsorship elements consistent with a lead sponsor for a team in the FCFL;
>
> iii.   After the expiration of the 3-year anniversary, any franchise purchase would be at fair market value at that time; and
>
> iv.   Other terms and conditions to be determined in good faith by the parties and memorialized in a separate Option Agreement within 90 days of this Agreement.[17]

The SAFT provided that the Option would "survive any termination or expiration of

[the SAFT]."[18]

---

[16] *Id.*

[17] *Id.*

[18] *Id.* § 2(c).

4

New Alchemy made the initial investment of $333,333 shortly after executing the SAFT.[19]  It did not make the second payment of $666,667 because FANchise failed to raise $10 million.[20]  And it never made an express payment of the $1,000 contemplated by the Option provision.[21]

### C.    The Purported Debts

On September 13, 2018, FANchise retained New Alchemy to provide software services.[22]  In exchange, FANchise agreed to pay New Alchemy an upfront fee of $15,000 and an additional $75,000 upon the occurrence of certain events.[23] On September 26, New Alchemy sent FANchise an invoice for the initial $15,000 owed.[24]  According to New Alchemy, the invoice went unpaid and was eventually written off as uncollectible.[25]  FANchise refutes that it owed the $15,000.[26]

---

[19] *See* Answer ¶ 21.

[20] *See id.* ¶ 27.

[21] *See* Pl.'s Opening Br. Supp. Mot. Summ. J. (Dkt. 35) ("Pl.'s Opening Br.") at 22; Pl.'s Combined Reply Br. Supp. Mot. Summ. J. and Answering Br. Opp'n Def.'s Cross Mot. (Dkt. 46) ("Pl.'s Combined Reply Br.") at 3; Def.'s Combined Opp'n Pl.'s Mot. Summ. J. and Opening Br. Supp. Cross Mot. for Summ. J. (Dkt. 42) ("Def.'s Combined Opp'n Br.") at 18; Def.'s Reply Br. Supp. Cross Mot. Summ. J. (Dkt. 49) ("Def.'s Reply Br.") at 2.

[22] Mickler Aff. Ex. 13 § 1.

[23] *Id.* § 3.

[24] Mickler Aff. Ex. 14.

[25] Mickler Aff. Ex. 15; Pl.'s Opening Br. 24.

[26] Def.'s Combined Opp'n Br. 24-26.

Also in September 2018, New Alchemy retained a developer to work on the FCFL project.[27] In November 2018, the developer sent New Alchemy a $21,600 invoice for his services.[28] New Alchemy contends that FANchise is responsible for this invoice.[29] FANchise disagrees.[30]

## D. The Restructuring Negotiations

In November 2018, the parties began to discuss amending the SAFT. The Dissolution Event was approaching. Its occurrence would necessitate repayment of New Alchemy's $333,333 investment.

On November 5, 2018, FANchise Chief Executive Officer Sohrob Farudi emailed New Alchemy Chief Executive Officer Peter Vessenes about a proposed restructuring of the SAFT.[31] A few weeks later, Farudi emailed Vessenes a different proposal.[32] On January 16, 2019, Vessenes offered to "relinquish [his] rights to a football team" in exchange for equity in the holding company that controlled the league.[33] Farudi responded: "You[r] investment was specifically carved out for FAN

---

[27] *See* Transmittal Decl. of Sarah E. Delia Supp. Def.'s Combined Opp'n Br. (Dkt. 42) ("Delia Decl.") Exs. C, E.

[28] Mickler Aff. Ex. 16.

[29] Pl.'s Opening Br. 24-25.

[30] Def.'s Combined Opp'n Br. 9-10, 25-26.

[31] Delia Decl. Ex. G; Answer ¶ 26.

[32] Mickler Aff. Ex. 10; Answer ¶ 27.

[33] Mickler Aff. Ex. 11; Answer ¶ 28.

Tokens + team tokens.  If we are moving it up to Holdco, which I'm not opposed to, the valuation needs to be consistent with other money we brought in at that time."[34]

The SAFT was not amended.[35]   The Dissolution Event came and went. FANchise did not repay New Alchemy's $333,333 initial investment until January 2022.[36]

### E.     The Inaugural Season

FCFL launched its first football season on February 13, 2021, with four teams competing over six weeks.[37]   The final game in the season would be played on March 20.[38]

On February 27, Vessenes sought to provide written notice of New Alchemy's desire to exercise its Option to acquire a football team and secure sponsorship

---

[34] Mickler Aff. Ex. 11; Answer ¶ 28.

[35] Def.'s Combined Opp'n Br. 13.

[36] Pl.'s Opening Br. 24 n.5.  New Alchemy accepted this payment with the understanding that doing so would not prevent it from arguing that the $333,333 investment served as payment for the $1,000 Option price. *Id.*

[37] Answer ¶ 13; *see also* Fan Controlled Football, *Fan Controlled Football (FCF) Announces Inaugural Season Set To Kick Off In February 2021 On Twitch*, PR Newswire (Sept. 22, 2020), https://www.prnewswire.com/news-releases/fan-controlled-football-fcf-announces-inaugural-season-set-to-kick-off-in-february-2021-on-twitch-301135899.html.

[38] *See* Joseph Zucker, *Ed Crouch's Late TD Gives Wild Aces 2021 FCF Championship over Glacier Boyz*, Bleacher Report (Mar. 20, 2021), https://bleacherreport. com/articles/2937303-ed-crouchs-late-td-gives-wild-aces-2021-fcf-championship-over-glacier-boyz.

rights.[39]   In response, Farudi told Vessenes that "there is no option available to exercise."[40]  Farudi explained that "[t]he additional $1,000 for the option set forth in Section 2(e) of the SAFT was never paid."[41]   Since payment was not made, Farudi said that "the 'Option Agreement' referenced in the SAFT . . . was never prepared or agreed [to]."[42]  Farudi further explained that "the SAFT provided that 'notice to exercise the Option must be provided no later than 30 days before the end of the initial season.'  The season ends March 20, so this date has passed."[43]

### F.    The Litigation

On June 1, 2021, New Alchemy filed a Verified Complaint advancing a breach of contract claim against FANchise.  New Alchemy alleges that FANchise breached the SAFT by:

> [failing] to provide New Alchemy with [FAN] Tokens or the equivalent in exchange for New Alchemy's investment; [failing] to provide New Alchemy with ownership of a team in the FCFL as required by the [O]ption section of the SAFT; [failing] to provide New Alchemy its team sponsorship rights; and [repudiating] the [O]ption by claiming it is "null and void." [44]

---

[39] Delia Decl. Ex. M.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Verified Compl. ¶ 37; *see also id.* ¶¶ 33-36, 38-39.

On November 12, New Alchemy filed a motion for a preliminary injunction.[45] The parties stipulated a proposed order resolving New Alchemy's motion, which I granted on November 22.[46] Under that order, FANchise agreed to reserve at least 80% equity in one FCFL team pending the resolution of this action.[47]

More than a year later, on November 28, 2022, New Alchemy moved for summary judgment on FANchise's liability for breaching the Option provision of the SAFT.[48] On January 27, 2023, FANchise cross-moved for summary judgment on the same issue.[49]

I heard oral argument on the cross-motions for summary judgment on April 5, 2023.[50] At the conclusion of argument, I asked for supplemental briefing, which was completed on April 26.[51] The matter was then taken under advisement.

---

[45] Dkt. 14.

[46] Dkt. 26.

[47] *Id.* ¶ 1.

[48] Dkt. 35.

[49] Dkt. 41.

[50] Dkt. 52, 55.

[51] *See* Pl.'s Suppl. Submission Supp. Mot. Summ. J. (Dkt. 56) ("Pl.'s Suppl. Submission"); Def.'s Suppl. Submission Opp'n Pl.'s Mot. Summ. J. (Dkt. 57) ("Def.'s Suppl. Submission"); *see infra* note 79 and accompanying text.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment is granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[52] Rule 56 authorizes summary judgment on "liability alone" without a concurrent resolution of damages.[53] "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[54]

The Delaware Supreme Court "'has described pure matters of contractual interpretation as readily amenable to summary judgment,' because 'proper interpretation of language in a contract . . . is treated as a question of law.'"[55] "In cases involving questions of contract interpretation, . . . courts will grant summary judgment in two scenarios: (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact."[56] The former scenario applies here because the SAFT is unambiguous.

---

[52] Ct. Ch. R. 56(c).

[53] *Id.*

[54] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[55] *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *3 (Del. Ch. Mar. 19, 2021) (first quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013); and then quoting *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991)).

[56] *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *7 (Del. Ch. Oct. 31, 2019), *aff'd*, 241 A.3d 220 (Del. 2020); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012) ("[I]n a dispute over the proper interpretation of a

FANchise argues that the Option is unenforceable because New Alchemy did not pay the $1,000 required to secure it. FANchise further contends that if the Option is found enforceable, New Alchemy's attempted exercise was untimely. New Alchemy, for its part, argues that the Option was one element of the consideration it received through the SAFT in exchange for its investment. New Alchemy also insists that it effectively paid the $1,000 Option price by writing off unpaid obligations FANchise owed it.

For the reasons explained below, I conclude that FANchise is entitled to summary judgment in its favor. New Alchemy's interpretation of the SAFT contravenes the plain text of the Option provision, which requires payment of an "additional $1,000."[57] It is undisputed that New Alchemy never paid the $1,000 consideration required to obtain the Option. New Alchemy's argument that FANchise's unpaid obligations effectively cover this payment has facial appeal, but it finds no support in the law.

### A. Applicable Principles of Contract Interpretation

Contract interpretation principles are well established under Delaware law, which governs the SAFT.[58] "Delaware law adheres to the objective theory of

---

contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation.").

[57] SAFT § 2(e).

[58] *Id.* § 7(b) (providing that Delaware law governs the SAFT).

11

contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[59] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[60] The court must construe the contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[61] A court will not look beyond the four corners of an agreement if a contract is unambiguous.[62]

## B. New Alchemy Lacks An Enforceable Option.

"An option contract ordinarily requires some consideration or a substitute for consideration in order to make it binding."[63] New Alchemy admittedly never paid or caused to be paid the $1,000 consideration for the Option.[64] "Failure of

---

[59] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[60] *Id.* at 368 (quoting *GMG*, 36 A.3d at 779).

[61] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[62] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[63] 1 *Williston on Contracts* § 5:17 (2023).

[64] *See Hensel v. U.S. Elecs. Corp.*, 262 A.2d 648, 651 (Del. 1970) ("If there is failure to consideration, even though the contract be under seal, then the contract is unenforceable because some supervening cause has made performance impossible."); 2 *Corbin on Contracts* § 5.20 (2023) ("'Failure of consideration' . . . mean[s] . . . that a performance for

12

consideration occurs when the bargained-for consideration is not rendered by one of the parties."[65]  Thus, New Alchemy lacks rights under the Option provision of the SAFT.[66]

New Alchemy makes three arguments against this outcome.  None succeed.

which the promisor bargained has not been rendered.  In many cases, though not in all, that failure is a good legal excuse for the promisor's refusal to perform, and it may be a good reason for compelling restitution if the promisor has already performed."); Restatement (Second) of Contracts § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."); *Puckett v. United States*, 556 U.S. 129, 137 (2009) ("When the consideration for a contract fails—that is, when one of the exchanged promises is not kept—we do not say that the voluntary bilateral consent to the contract never existed, so that it is automatically and utterly void; we say that the contract was broken.").

[65] *Baynard v. Jervey*, 1985 WL 21132, at *3 (Del. Ch. July 5, 1985).

[66]  To the extent the Option provision does not set a deadline for New Alchemy to make the additional payment, a reasonable deadline for performance can be inferred.  *See Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015) ("Under Delaware law, when a contract does not have a deadline or other time specified, the parties have a 'reasonable' amount of time to perform the contract."); *see also* Restatement (Second) of Contracts § 41 (1981); *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) ("Courts utilize the implied covenant [of good faith and fair dealing] 'to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017))).  As an outermost bound, the deadline for performance would be when the option became exercisable, which was "after the initial season [which began on February 13, 2021 and ended on March 20, 2021], or Jan. 2020, whichever is sooner."  SAFT § 2(e)(i).  That time has long passed.  And irrespective of any deadline, the $1,000 remains unpaid.  *See supra* note 21.

## 1.     The Interrelated Contract Argument

First, New Alchemy argues the SAFT does not require payment of an "additional $1,000."[67]  In New Alchemy's view, the $333,333 initial investment and the Option "were interrelated components of a single contract."[68]  As such, New Alchemy avers, the initial investment served as consideration for the Option.

In certain instances, an "option is simply a subsidiary part of a larger transaction" where it "is not necessary for either the parties or the court to make a separate valuation of the option" for it to be enforceable.[69]  That is not the situation here.  The SAFT contemplates two separate exchanges that—though parts of the same document—concern distinct rights and consideration.

The first exchange is described in Section 2(a) of the SAFT.  New Alchemy obtained the right to receive FAN Tokens in exchange for a "Purchase Commitment Amount" of $1 million.[70]  If a Dissolution Event occurred "before th[e] SAFT expire[d] or terminate[d]," Section 2(b) of the SAFT required FANchise to repay New Alchemy's investment.[71]

---

[67] Pl.'s Opening Br. 22-25; Pl.'s Combined Reply Br. 4-7; Pl.'s Suppl. Submission ¶¶ 7-11.

[68] Pl.'s Combined Reply Br. 4.

[69] *Walsh v. White House Post Prods., LLC*, 2020 WL 1492543, at *5 n.33 (Del. Ch. Mar. 25, 2020) (quoting 3 Corbin on Contracts § 11.7 (1996)).

[70] SAFT §§ 1(h), 1(i), 2(a); *see also id.* at Recitals, Ex. A (stating that the "Purchase Commitment Amount" was $1 million).

[71] *Id.* § 2(b).

14

The second exchange is addressed in Section 2(e) of the SAFT. "[I]n exchange for an additional $1,000," FANchise would grant New Alchemy "an option . . . to acquire a franchise in the FCFL" and obtain sponsorship rights.[72] The Option would then be exercisable "with no additional fee."[73] "[T]he option provision described in Section 2(e)" would "survive any termination or expiration of [the SAFT]."[74]

The two-tiered $1 million Purchase Commitment Amount is separate from the $1,000 Option payment; the former cannot satisfy the latter. The SAFT unambiguously requires an "*additional* $1,000" of consideration in exchange for the Option.[75] "Additional" means "added" or "extra."[76] Because the additional consideration was not paid, the Option is unavailable.

---

[72] *Id.* § 2(e).

[73] *Id.* § 2(e)(i).

[74] *Id.* § 2(c).

[75] *Id.* § 2(e) (emphasis added).

[76] *Additional*, Meriam-Webster, https://www.meriam-webster.com/dictionary/additional (last visited July 18, 2023); *Additional*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/additional (last visited July 18, 2023); *see Lorillard Tobacco*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

### 2. The Immateriality Argument

Second, New Alchemy avers that the $1,000 consideration for the Option should be excused as immaterial in the context of its $333,333 initial investment. But $1,000 is not nominal, and the overall size of New Alchemy's investment is irrelevant. The parties bargained for separate consideration in exchange for discrete rights. New Alchemy's argument would effectively read the "additional $1,000" language out of the Option provision.

Regardless, even nominal consideration must be paid before an option becomes enforceable.[77] New Alchemy failed to pay the $1,000 needed to secure the Option.

### 3. The Recoupment and Setoff Arguments

Third, New Alchemy argues that the $1,000 Option price was effectively satisfied by funds that FANchise owes it. Specifically, it maintains that FANchise's

---

[77] *See Kaplan v. Beach Dev. Corp.*, 1988 WL 55324, at *5 (Del. Super. May 23, 1988) (observing that "the parties could have turned this transaction into an option contract with a power of acceptance by simply providing for consideration"); *Walsh*, 2020 WL 1492543, at *5 n.33 (Del. Ch. Mar. 25, 2020) ("At common law, an offeror's promise to keep an offer open must be supported by consideration."); *see also* 3 Corbin on Contracts § 11.7 (2023) ("Often, a nominal consideration will be upheld so that, for instance, one dollar (actually paid or promised) is sufficient to make the offered promise irrevocable, just as sealing and delivery would."); 1 *Williston on Contracts* § 5:17 (2023) ("An option contract ordinarily requires some consideration or a substitute for consideration in order to make it binding.").

16

failure to repay New Alchemy's $333,333 initial investment after the Dissolution Event offsets the $1,000 Option payment.[78]

Although this argument is theoretically intriguing, it is without legal support. New Alchemy's summary judgment briefs did not cite any precedent addressing whether one party's unpaid consideration is offset by debt owed to it from the counterparty. After I requested supplemental briefing on the subject, New Alchemy raised arguments under the doctrines of recoupment and setoff.[79] Neither doctrine applies.

"Recoupment is a common-law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff."[80] "A successful recoupment claim is limited to the extent of the

---

[78] New Alchemy's arguments have shifted throughout the litigation. New Alchemy originally claimed three sources of funds FANchise owes it: the $15,000 invoice that it says became due in September 2018; the $21,600 invoice from the developer New Alchemy hired to work on the FCFL project; and the $333,333 from the initial investment under the SAFT. Pl.'s Opening Br. 23-25; *see supra* notes 22-30 and accompanying text. At present, New Alchemy focuses its recoupment and setoff arguments only on the $333,333 initial investment. Pl.'s Combined Reply Br. 6-8; Pl.'s Suppl. Submission ¶ 12. This may be because neither the September invoice nor the developer invoice satisfy the "transactional nexus" prong of recoupment and setoff. *See Claros Diagnostics, Inc. S'holders Representative Comm. v. OPKO Health, Inc.*, 2020 WL 829361, at *9 (Del. Ch. Feb. 19, 2020) ("Delaware law looks at recoupment's 'transactional nexus' prong with a jaundiced eye, requiring it be 'tightly constrained.'" (quoting *Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 450 (Del. 2016))). The only obligation arguably related to the SAFT is the $333,333 initial investment.

[79] Pl.'s Suppl. Submission ¶¶ 11-16.

[80] *TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 859 (Del. Ch. 2004) (quoting 80 C.J.S. *Set-off and Counterclaim* § 2 (2000)).

plaintiff's recovery."[81] To assert recoupment, "the defendant must show that '(i) the claims arose out of the same transaction or occurrence [that is, that they have a close 'transactional nexus'], (ii) it is sought defensively rather than as the basis for affirmative recovery, and (iii) the nature of the relief sought is similar to the plaintiff's."[82]

The second element of recoupment is unmet. New Alchemy says that "it merely asks the Court to find that [FANchise's] defensive breach of contract argument fails."[83] New Alchemy has it backwards. It is New Alchemy that must prove the existence of an enforceable contract—that is, an offer, acceptance, and consideration.[84] New Alchemy seeks to use recoupment to demonstrate consideration, but the defense of recoupment cannot "provide a basis for affirmative relief."[85]

---

[81] *Claros Diagnostics*, 2020 WL 829361, at *8.

[82] *Id.* (quoting *Universal Enter. Grp., L.P. v Duncan Petroleum Corp.*, 2013 WL 4833706, at *2 (Del. Ch. Sep. 10, 2013), *aff'd*, 99 A.3d 228 (Del. 2014)).

[83] Pl.'s Suppl. Submission ¶ 12.

[84] *Seiden v. Shu Kaneko*, 2017 WL 1093937, at *5 (Del. Ch. Mar. 22, 2017) ("It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration."), *aff'd*, 177 A.3d 69 (Del. 2017).

[85] *Household Fin. Corp. v. Hobbs*, 387 A.2d 198, 199 (Del. Super. 1978); *see also Shuman v. Santora*, 1991 WL 18101, at *3 (Del. Super. Feb. 5, 1991); *MCI Telecomm. Corp. v. Wanzer*, 1990 WL 91100, at *13 (Del. Super. June 19, 1990); 80 C.J.S. *Set-off and Counterclaim* § 1 (2023) ("[R]ecoupment is a defensive claim.").

Setoff is likewise inapplicable. "Setoff and recoupment are related but different defenses."[86] A setoff is "a counterdemand which a defendant holds against a plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action."[87] New Alchemy has not asserted a counterdemand against FANchise.[88] Its setoff argument fails for the same reason as its recoupment argument: neither doctrine may be used offensively.[89]

### C. Equitable Estoppel Does Not Apply.

Finally, New Alchemy avers that FANchise should be equitably estopped from arguing that the Option is unenforceable because FANchise (allegedly) represented otherwise while negotiating potential SAFT amendments. New

---

[86] *Finger Lakes*, 151 A.3d at 453 ("[T]he defense of set-off arises out of an independent transaction, but the defense of recoupment goes to the reduction of the plaintiff's damages for the reason that he, himself, has not complied with the cross obligations arising under the same contract.").

[87] *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *5 (Del. Ch. Sept. 21, 2011) (quoting 80 C.J.S. *Set-off and Counterclaim* § 3 (2011)); *see also Finger Lakes*, 151 A.3d at 453 ("Set-off is a mode of defense by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part."); 80 C.J.S. *Set-off and Counterclaim* § 5 (2023) ("'Set-off' is a legal or equitable remedy that may occur when two entities that owe money to each other apply their mutual debts against each other.").

[88] *See Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *18 n.194 (Del. Ch. Sept. 19, 2022) (rejecting the reliance on a "setoff" defense where the defendant had not made a counterdemand).

[89] *See* 80 C.J.S. *Set-off and Counterclaim* § 5 (2023) ("Relief by way of a set-off is limited to reducing or defeating the plaintiff's claim. The defendant may not obtain affirmative relief against the plaintiff based on the affirmative defense of set-off.").

Alchemy's equitable estoppel argument may well be misplaced since it concerns a bargained-for contract right.[90]  But even if equitable estoppel were an apt argument, it cannot aid New Alchemy.  "This Court does not lightly turn to equitable estoppel to enforce contract rights which cannot be vindicated as the contract is written."[91]

"[E]quitable estoppel is invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'"[92]  To prevail on this theory, New Alchemy "must demonstrate that: (i) [it] lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) [it] reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) [it] suffered a prejudicial change of position as a result of their reliance."[93]  New Alchemy has not shown any of these elements.

---

[90] *Hallisey v. Artic Intermediate, LLC*, 2020 WL 6438990, at *4 (Del. Ch. Oct. 29, 2020) (ORDER) ("Where the representation or promise at issue is documented in a contract supported by valid consideration, equitable estoppel is not applicable.  In a dispute about enforcement of a bargained-for contract right, equitable estoppel is not the proper remedy."); *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000) (observing that the doctrine of equitable estoppel "is not applicable to cases in which the alleged promise is supported by consideration"); *see also Brandywine Shoppe, Inc. v. State Farm Fire & Cas. Co.*, 307 A.2d 806, 809 (Del. Super. 1973) ("As a general rule, the doctrines of estoppel and waiver may not be invoked to make a new contract, or to change radically the terms of the policy to cover additional subject matter.").

[91] *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 WL 1223026, at *23 (Del. Ch. Mar. 14, 2019).

[92] *Id.* (quoting *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005)).

[93] *Id.*; *see also Olson v. Halvorsen,* 2009 WL 1317148 at *11 (Del. Ch. May 13, 2009) ("To prevail on a claim of equitable estoppel, a plaintiff must show '(1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that

First, New Alchemy knew that the Option required a $1,000 payment based on the SAFT's express terms.[94] "Estoppel is inappropriate when the asserting party has been 'misled though his or her own want of attention to proper means of information.'"[95] "The proper means of information in this case is the [SAFT]."[96] Second, and relatedly, New Alchemy cannot have reasonably relied on representations FANchise made about the Option's enforceability since New Alchemy knew about the prerequisite $1,000 payment.[97] Finally, New Alchemy did not change its position in reliance on FANchise's purported statements. New Alchemy failed—at all times—to pay the $1,000 Option price.[98]

---

which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.'" (quoting *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006))).

[94] *Meritxell, Ltd. v. Saliva Diagnostic Sys., Inc.*, 1998 WL 40148, at *11 (S.D.N.Y. Feb. 2, 1998) (applying Delaware law to hold that where a contract stated requirements for converting a debenture, equitable estoppel was inapplicable).

[95] *Id.* at *11 (quoting *Am. Fam. Mortg. Corp. v. Acierno*, 1994 WL 144591, at *5 (Del. Mar. 28, 1994)) (cleaned up); *see also Am. Fam.*, 1994 WL 144591 at *5 ("One cannot bury one's head and hope that equitable estoppel will prevent the assertion of another's right.").

[96] *Meritxell*, 1998 WL 40148, at *11.

[97] New Alchemy "negotiated for th[e option] right, and was constructively aware of it." *Vintage Rodeo*, 2019 WL 1223026, at *23. It therefore cannot have reasonably relied on FANchise's alleged representations. *See id.*

[98] *See Hallisey*, 2020 WL 6438990, at *4 ("[I]t is unclear that Buyer changed its position in reliance on any representation; it did not decide *not* to submit a Closing Date Report, but decided to perform more analysis first.").

## III. CONCLUSION

For the reasons explained above, FANchise is entitled to summary judgment on the outstanding claim in Count I of the Verified Complaint relating to the enforceability of the Option.  New Alchemy's motion for summary judgment is denied.  FANchise's cross-motion for summary judgment is granted.